**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 28 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff,

v.

CESAR GONZALES aka Cougar;
HECTOR GABRIEL LOPEZ aka
Shaggy; URIEL MARTINEZ aka Duke;
CESAR JUAREZ aka Pelon; GUSTAVO
AZCUENAGA aka Mono; LUIS
DELCID aka Stranger; ERNEST
GUEVARA aka Yogi; RUSSELL
BARBOA aka Chino; JOHN ACOSTA
aka Lefty; BYRON ZAMORA aka
Trigger; OSCAR VILLA aka Wino;
RICHARD ACOSTA aka Shorty;
ROGER PRECIADO aka Cartoon;
JAIME VILLA aka Psycho; MARCOS
MAZZINI aka Lucky; VINCENT
NAJAR aka Stalker; JASON
DELATORRE aka J Bone; CHARLES
TAYLOR aka Yogie; URIEL
BUSTAMONTE aka Caps; MICHAEL
MORA aka M&M; DAVID GALLARDO
aka Cyclone; NEAL POLUS aka Troy
Thompson aka Evil; FRANK LARA, aka
Spooky,

Defendants - Appellees,

No. 97-2064

ALBUQUERQUE JOURNAL,

Intervenor,

NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS;
NEW MEXICO CRIMINAL DEFENSE
LAWYERS ASSOCIATION,

Amici Curiae.

UNITED STATES OF AMERICA,

Plaintiff,

v.

CESAR GONZALES aka Cougar;
CESAR JUAREZ aka Pelon; GUSTAVO
AZCUENAGA aka Mono; LUIS
DELCID aka Stranger; ERNEST
GUEVARA aka Yogi; RUSSELL
BARBOA aka Chino; JOHN ACOSTA
aka Lefty; BYRON ZAMORA aka
Trigger; OSCAR VILLA aka Wino;
RICHARD ACOSTA aka Shorty;
ROGER PRECIADO aka Cartoon;
MARCOS MAZZINI aka Lucky;
VINCENT NAJAR aka Stalker; JASON
DELATORRE aka J Bone; CHARLES
TAYLOR aka Yogie; URIEL
BUSTAMONTE aka Caps; NEAL
POLUS aka Troy Thompson aka Evil,

Defendants-Appellants,

No. 97-2095

ALBUQUERQUE JOURNAL,

Intervenor,

NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS;
NEW MEXICO CRIMINAL DEFENSE
LAWYERS ASSOCIATION,

Amici Curiae.

UNITED STATES OF AMERICA,

Plaintiff,

v.

CESAR GONZALES aka Cougar;
URIEL MARTINEZ aka Duke; CESAR
JUAREZ aka Pelon; GUSTAVO
AZCUENAGA aka Mono; LUIS
DELCID aka Stranger; ERNEST
GUEVARA aka Yogi; RUSSELL
BARBOA aka Chino; JOHN ACOSTA
aka Lefty; BYRON ZAMORA aka
Trigger; OSCAR VILLA aka Wino;
RICHARD ACOSTA aka Shorty;
ROGER PRECIADO aka Cartoon;
MARCOS MAZZINI aka Lucky;
VINCENT NAJAR aka Stalker; JASON
DELATORRE aka J Bone; CHARLES
TAYLOR aka Yogie; URIEL
BUSTAMONTE aka Caps; MICHAEL
MORA aka M&M; DAVID

No. 97-2101

-3-

GALLARDO aka Cyclone; NEAL
POLUS aka Troy Thompson aka Evil,

Defendants,

and

HECTOR GABRIEL LOPEZ aka
Shaggy; JAIME VILLA aka Psycho;
FRANK LARA aka Spooky,

Defendants-Appellants.

ALBUQUERQUE JOURNAL,

Intervenor,

NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS;
NEW MEXICO CRIMINAL DEFENSE
LAWYERS ASSOCIATION,

Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CR-95-538-MV)**

William S. Dixon (Charles K. Purcell with him on the briefs), Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, New Mexico, for Intervenor/Appellant Albuquerque Journal.

Gail J. Evans, Hannum & Evans, Albuquerque, New Mexico, for Appellees Cesar Gonzales, Cesar Juarez, Gustavo Azcuenaga, Luis Delcid; Ernest Guevara; Russell Barboa; John Acosta; Byron Zamora; Oscar Villa; Richard Acosta; Roger

Preciado; Marcos Mazzini; Vincent Najar; Jason Delatorre; Charles Taylor; Uriel Bustamonte; and Neal Polus.

Marc H. Robert, Barnett, Allison & Robert, Albuquerque, New Mexico, for Appellees Hector Gabriel Lopez, Jaime Villa, and Frank Lara.

Steven G. Farber, Santa Fe, New Mexico, and Barbara Bergman, Albuquerque, New Mexico, filed an amici curiae brief for National Association of Criminal Defense Lawyers and New Mexico Criminal Defense Lawyers Association.

---

Before **ANDERSON, McKAY,** and **BRISCOE**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

We must determine in this case whether the press has a constitutional, common law, or statutory right of access to court-sealed fee, cost, and expense applications and related information filed under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, by court-appointed criminal defense attorneys, as well as transcripts from hearings and court orders concerning those applications. If there is a right of access, then at what time and under what conditions.

Construing Intervenor Albuquerque Journal's appeal and the Defendants' cross-appeals as petitions for writs of mandamus,[1] we hold as follows: (1) there

---

[1] Because "mandamus is the proper vehicle for reviewing court orders sealing or redacting court documents in criminal proceedings," United States v. McVeigh, 119 F.3d 806, 810 (10th Cir. 1997) (per curiam), cert. denied, 118 S.

(continued...)

is no First Amendment right of access to documents provided as backup detail for CJA vouchers, or certain related motions, orders, and transcripts; (2) there is no right of access to CJA vouchers or related information pursuant to the common law because, even if relevant common law previously existed on this subject, it has been supplanted by the CJA; and (3) the press has no statutory right of access to the materials in question, but the court has discretion to release certain material subject to the conditions outlined below. Applying these principles to this case, we hold that the court acted within its discretion in ordering the release of the CJA vouchers (as defined below) at the end of all Defendants' sentencing hearings and in ordering the release of the total amounts expended in individual cases at the end of each Defendant's sentencing hearing; but the court abused its discretion in ordering the unconditional release of the sealed backup documents, motions, orders, and transcripts at the end of all Defendants' sentencing hearings because the court incorrectly concluded that the interests governing whether or not particular information should be redacted or remain under seal terminate at

[1](...continued)
Ct. 1110 (1998) ("McVeigh II"), we treat the appeal and cross-appeals as petitions for writs of mandamus. Although there may be a strong argument in favor of reviewing the cross-appeals as appeals from a collateral order under Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949), we would reach the same result applying the applicable standards under either doctrine.

the conclusion of the trials. Accordingly, we deny the Journal's application for a writ of mandamus and grant a writ of mandamus to the Defendants.

# I.

## BACKGROUND

Twenty-three Defendants were indicted by a federal grand jury in the District of New Mexico for various offenses, including murder, attempted murder, drug distribution, and racketeering. All of the Defendants are indigent, and accordingly, the district court appointed each Defendant counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.[2] The Defendants are allegedly members of the "Sureno 13" street gang in Albuquerque, New Mexico, and the case has attracted wide-spread media attention. Several of the Defendants ("Cooperating Defendants"), as well as other non-indicted individuals, entered into agreements with the government to cooperate in the investigation and prosecution of the case. Some of these Cooperating Defendants will testify at the trials of the other Defendants and several of the Cooperating Defendants and cooperating individuals have been admitted into the Witness Security Program, 18 U.S.C. §§ 3521-28. Many of the remaining Defendants ("Non-Cooperating Defendants")

---

[2]One Defendant, Uriel Martinez, has not been apprehended.

have also entered into plea agreements with the government. The government

seeks the death penalty as to three Defendants. R. Vol. I at 164-65.

## A.    The CJA Payment Process

Pursuant to the CJA and the Administrative Office of United States Courts'

Guide to Judiciary Policies & Procedures, attorneys appointed by the court to

represent indigent defendants in criminal cases are paid by the government out of

funds appropriated for that purpose. These attorneys claim compensation and

expenses by submitting prescribed forms: CJA form 30 for death penalty cases

and form 20 for all other cases.[3] These forms are generally submitted at the end

of trial in non-capital cases, but the court may grant an attorney's request for

interim billing, which is more common in capital cases because the proceedings

are typically longer. The forms require the attorney to list any expenses incurred

and to categorize his or her time spent in each of the following areas:

arraignment and/or plea, bail and detention hearings, motions hearings, trial,

sentencing hearings, revocation hearings, appeals court, other in-court hearings,

---

[3]The rate of compensation for counsel is not to exceed the statutory maximum and may not exceed a total amount in each case unless the total maximum amount is waived by the district court upon approval by the chief judge of the circuit. See 18 U.S.C. § 3006A(d). In death penalty cases, the rate of compensation is not to exceed the statutory maximum, but there is no statutory limit on the total amount that may be paid. See 21 U.S.C. § 848(q)(10)(A).

interviews and conferences, obtaining and reviewing records, legal research and brief writing, travel time, and investigative and other work. The voucher consists of a single page. A current version of form 20 is attached hereto.

On application by appointed counsel, and after an ex parte hearing, the court may also allow the defense to engage the services of law clerks, investigators, experts in various fields, and others, whose compensation is not to exceed amounts specified by statute, unless that amount is waived. See 18 U.S.C. § 3006A(e)(3); 21 U.S.C. § 848(q)(10)(B).[4] Requests for compensation for these services are submitted on CJA form 31 for death penalty cases and on form 21 for all other cases. These forms require information as to the type of services performed, such as psychiatric, fingerprint, or ballistics, and an itemization of services rendered and expenses incurred. These forms are also generally submitted at the end of trial in non-capital cases, but the court may allow interim billing and generally does so in capital cases. Both forms 21 and 31 consist of a single page. A current version of form 21 is attached hereto.

In addition to the information contained on forms 20, 21, 30, and 31, the applicants must submit backup documentation, including detailed time sheets

---

[4]We have repeatedly emphasized that defendants must provide the district court with explicit detail showing why the requested services are "necessary" to an adequate defense and what the defendant expected to find by using the services. See, e.g., United States v. Kennedy, 64 F.3d 1465, 1470 (10th Cir. 1995); United States v. Mundt, 508 F.2d 904, 908 (10th Cir. 1974).

specifying the specific services performed and receipts for expenses incurred.

The district court has discretion as to the amount of supporting detail it will

require, and therefore the amount of detail contained in the backup documentation

varies depending on the judge as well as the complexity of the case. Motions and

orders relating to the appointment of individuals other than counsel as well as

transcripts from ex parte hearings related thereto are generally placed under seal.

CJA vouchers and backup documentation related to services of counsel and non-

counsel and any motions, orders, and hearing transcripts related to services of

counsel are not required to be placed under seal. The practice of sealing these

materials varies with the circumstances.

Our analysis, then, deals with three categories of information: (1) the CJA

forms (vouchers) themselves; (2) backup documentation to the vouchers; and (3)

motions, orders, and hearing transcripts.[5] For convenience in this opinion we

refer to the first type of document, which includes only the single page form, as

CJA forms or vouchers. The second category of documents includes any material

attached to the vouchers, including receipts, time sheets, and other detailed

---

[5]The sealed record on appeal contains transcripts of interviews with numerous Defendants conducted by attorneys for several other Defendants. Our reading of the district court's order leads us to believe that these transcripts are not included in those "CJA-related documents, motions, orders, and transcripts" to be released after the last remaining defendant is sentenced. United States v. Gonzales, No. CR-95-538-MV, 1997 WL 155403, at *13 (D.N.M. Feb. 11, 1997).

information, which we will refer to as backup documentation. The third category includes any motions, orders, and transcripts of hearings regarding the appointment and compensation of attorneys, experts, law clerks, investigators, and others. In addition, in this case the total amounts to be released under the district court's order are compiled by the court clerk from the vouchers, but they are not the entire or partial vouchers themselves, so we are also dealing with a category of extracted and summarized information.

## B.     Proceedings in the District Court

In this case, the court granted, on November 28, 1995, defense counsels' joint motion to submit requests for compensation on a monthly basis pursuant to 18 U.S.C. § 3006A and the rules governing the administration of the CJA, specifically, VII Administrative Office of United States Courts, Guide to Judiciary Policies & Procedures ("AO Guide"), chap. II, part C, § 2.30; chap. III, part A, § 3.06; app. E, F, because of the complexity and the anticipated length of the proceedings. But in doing so, the court required that the documentation supporting requests for interim payments contain a very high level of detail, including information that, according to the district court, would reveal privileged information. Supplemental R. Vol. I, Tab 2073 at 5-6 (district court order granting in part defendants' motion to stay pending appeal). Realizing that some

of the materials submitted to the court had not been placed under seal, Defendants

jointly moved the court to place all vouchers, backup documentation, motions,

and orders related to CJA billing under seal. On February 20, 1996, the court

granted the motion. Additionally, all CJA-related hearings have been held ex

parte and the transcripts of those hearings are sealed.

On July 26, 1996, the Albuquerque Journal filed a motion to unseal all CJA

vouchers, backup documentation, motions, orders, and other documents that had

been filed, as well as the hearing transcripts. The government consented to the

motion, "except to the extent that unsealing of filings would disclose the

identities or location of cooperating witnesses or informants." R. Vol. II, Tab 923

at 4. The Defendants opposed the motion.

Construing the motion as a petition for a writ of mandamus pursuant to 28

U.S.C. § 1361, the district court, on February 11, 1997, ordered that the clerk

release (1) the total attorney fees and overall total paid through CJA funds as to

each Defendant as soon as that Defendant was sentenced,[6] and (2) all of the other

CJA materials, that is, the vouchers, backup documentation, motions, orders, and

hearing transcripts pertaining to all Defendants, as soon as the last remaining

---

[6]Because some of the Defendants had already been sentenced at the time of
the district court's order, the court ordered the immediate release of the totals as
to those defendants, and those amounts have already been made public. Since
then, many other defendants have been sentenced, and those amounts have also
been made public. Obviously, this case is moot as to that particular information.

Defendant had been sentenced. The court based its order primarily on the theory

that the press has a qualified First Amendment right of access to the information

in question, but that the interests of the Defendants and a fair trial outweighed

those of the press until the end of trial. The court held, alternatively, that the CJA

statutory scheme supplants the common law and embodies traditional concepts of

confidentiality, giving the court discretion to seal documents when fair trial or

privacy interests are threatened.

## C.    The Appeal

The Albuquerque Journal appeals from the district court's order, arguing

that under the First Amendment, the common law or the CJA statute, all of the

CJA-related vouchers, backup documentation, motions, orders, and hearing

transcripts should be released immediately, or, in the alternative, that the court

should narrowly tailor its restriction on the right to access by sealing only certain

documents and by redacting information in others.

The Cooperating Defendants and Non-Cooperating Defendants have each

filed a cross-appeal.[7] They contend that the court's order violates the Defendants'

---

[7]Although the Cooperating Defendants have interests peculiar to their specific situations, they join the arguments made in the Non-Cooperating Defendants' briefs. Answer Br. & Br. in Chief for Lara, et al. at 1-2. The distinct issue that the Cooperating Defendants raise—and that the Non-

(continued...)

right to a fair trial, protection against self-incrimination, attorney-client privilege, attorney work product, equal protection, and privacy interests, and that to protect those rights, the backup documentation, motions, orders, and hearing transcripts must remain permanently sealed. They do not dispute, however, the release of the total amounts expended on each Defendant or the release of properly redacted vouchers at the end of all proceedings. Amici curiae National Association of Criminal Defense Lawyers and New Mexico Criminal Defense Lawyers Association urge us in a joint brief to do whatever is necessary to ensure that defendants facing the death penalty have effective assistance of counsel through confidential attorney-client communications and trial strategies. Our analysis disposes of both the appeal and cross-appeals.

Pending this appeal, the district court has stayed that portion of its order which would release all of the CJA materials at the conclusion of all proceedings.

---

[7](...continued)
Cooperating Defendants agree with—is that information contained in the backup documentation may jeopardize the safety of individuals who have cooperated with the government, especially those who are now in the Witness Protection Program. Disclosure of this information will not only hurt those who have aided the government in this case, but it will also discourage future defendants, informants, and witnesses from cooperating with the government. Id. at 4-8.

## II.

## DISCUSSION

In determining whether to grant a writ of mandamus, we consider the following "'nonconclusive guidelines'":

"(1) whether the petitioner seeking the writ has no other adequate means to secure the relief desired;
(2) whether the petitioning party will be damaged or prejudiced in a way not correctable on appeal;
(3) whether the district court's order constitutes an abuse of discretion;
(4) whether the court's order represents an often repeated error and manifests a persistent disregard of federal rules; and,
(5) whether the district court's order raises new and important problems or legal issues of first impression."

McVeigh II, 119 F.3d at 810 (quoting United States v. Roberts, 88 F.3d 872, 882-83 (10th Cir. 1996)).

The first and fifth factors are satisfied here. The second factor is applicable insofar as it asks whether the Albuquerque Journal could have any wrong addressed in a direct appeal. The third and fourth factors are "inextricably linked" such that the case "really boils down to whether the district court abused its discretion in sealing and redacting the documents here sought by petitioners. That requires an analysis of whether the documents are subject to the [Albuquerque Journal's] First Amendment and common law rights of access, and whether the district court clearly violated a legal duty in its assessment of how those rights apply to the documents." McVeigh II, 119 F.3d at 810-11.

-15-

## A.    The First Amendment

The Albuquerque Journal argues that it has a First Amendment right of access to all of the CJA materials.  Although we avoid deciding constitutional issues where narrower grounds for a decision exist, see McKenzie v. Renberg's Inc., 94 F.3d 1478, 1488 n.11 (10th Cir. 1996), cert. denied, 117 S. Ct. 1468 (1997), since the district court here resolved the issue on constitutional grounds and since the statute does not address all grounds of the Albuquerque Journal's argument, we address the constitutional issue first.

### 1.

We make two initial points at the outset in order to place the Journal's constitutional arguments in perspective.

First, to the extent the Journal bases its arguments on a claim that the public has a right to know how public funds are being spent in individual criminal cases, its logic is spoiled by the facts.  The Journal does not seriously dispute that it cannot get the type of data it seeks here from the Department of Justice with respect to prosecution costs,[8] or from Federal Public Defender Offices (which

---

[8]The United States Attorney's Office pays its attorneys and other staff from funds approved by the Attorney General, see 28 U.S.C. §§ 548-50, and investigative, expert and other services performed by the FBI and other governmental agencies are paid out of applicable agency budgets.  Although the
(continued...)

handle up to 75% of the indigent defendant caseload in districts where such offices are located).[9] Those two sources of expenditures, when combined, account for the bulk of public funds spent on criminal prosecutions involving indigent defendants—all unavailable to the press in the type of detail sought here.

The Journal's fall-back refinement of its position is that a constitutional right of access springs into being as to the public funds here because a judge is involved in approving the requests for funds (presumably as opposed to judicially unsupervised expenditures by the government, for example). That brings us to our second point.

Just as trial-related expenditures, reviews, requests, and approvals for funds in the Department of Justice and Federal Public Defender's Offices are administrative, not judicial, functions, so is the CJA voucher process. Forms 20,

[8](...continued)
Department of Justice is subject to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, we have been directed to no authority thereunder that provides for the release of detailed case-by-case information, much less the minute detail sought in this particular case.

[9]See Theodore J. Lidz, "Summary of Defender Services Issues under the CJA," in II Federal Courts Study Committee Working Papers & Subcommittee Reports, part IVB at 9 (July 1, 1990) (hereinafter "Fed. Courts Study Committee"). Federal public defenders and their para-legals, investigators, and experts who represent indigent defendants are paid from that organization's budget, which is administered through the Administrative Office of the United States Courts, under the direction of the Judicial Conference of the United States, see 18 U.S.C. § 3006A(g)(2)(A); 28 U.S.C. § 605; AO Guide, chap. IV, §§ 4.02-.03, but is not subject to FOIA. See 5 U.S.C. § 552(f); AO Guide, chap. V, § 5.01.

21, 30 and 31, and the guidelines promulgated for their use by court and counsel, are *all* generated through the Administrative Office of the United States Courts under authority granted to the Judicial Conference of the United States. They are purely administrative. And, the court essentially acts in an administrative, not a judicial, capacity when approving voucher requests and related motions for trial assistance. See, e.g., United States v. Davis, 953 F.2d 1482, 1498 n.21 (10th Cir. 1992) ("Fee determinations by the district judge pursuant to the Criminal Justice Act are administrative in character and do not constitute final appealable orders within the meaning of 28 U.S.C. § 1291.").

The administrative nature of the process is apparent from its format as well as its forms. The process is nonadversarial. That is, the court acts ex parte, and there is no appeal from the denial or reduction of compensation.[10] At most, grounds for a later appeal might be created by the denial of funds for expert witnesses, investigators, or other services relating to an adequate defense. In that latter sense, perhaps, the court at most is acting in a quasi-judicial capacity in the CJA process.[11]

---

[10]See Fed. Courts Study Committee at 6-7; Davis, 953 F.2d at 1498 n.21.

[11]We note that there is much support for the replacement of judges with an independent administrative board, which would handle the judiciary's present functions in administering the CJA. See generally Committee to Review the Criminal Justice Act, Judicial Conference of the United States, Final Report, 1993 WL 69540, at *35-39, 108 nn.oo-ww (Jan. 29, 1993).

-18-

Finally, the vouchers and related information are not trial documents in any accepted sense of that term. They do not go to the guilt, innocence or punishment of a defendant. They are not evidence of the crime. They are entirely ancillary to the trial.

The fact that the information is filed with the court does not alter the situation. Not all documents filed with a court are considered "judicial documents." See United States v. El-Sayegh, 131 F.3d 158, 161 (D.C. Cir. 1997); United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995). But see Pansy v. Borough of Stroudsburg, 23 F.3d 772, 782 (3d Cir. 1994). And, as indicated, the CJA documents are not directly related to the process of adjudication. The documents are not even related to the defendant's indigent status, for which he or she receives CJA aid.

The conclusion that CJA determinations are not trial documents is further supported by the fact that neither prosecutors nor federal public defenders are required to submit to the court documentation of their expenditures in criminal cases. Cf. United States v. McDougal, 103 F.3d 651, 656-57 (8th Cir. 1996), cert. denied, 118 S. Ct. 49 (1997).

Looked at as essentially administrative in nature, it is clear that no First Amendment right of access applies to CJA documents any more than it applies to administrative documents located in the executive branch. See El Dia, Inc. v.

Hernandez Colon, 963 F.2d 488, 494-95 (1st Cir. 1992); see, e.g., Calder v.

Internal Revenue Serv., 890 F.2d 781, 783-84 (5th Cir. 1989) (denying First

Amendment right of access to IRS records held by that agency); Capital Cities

Media, Inc. v. Chester, 797 F.2d 1164, 1175-76 (3d Cir. 1986) (denying First

Amendment right of access to records of state agency).

**2.**

Even if we assume for purposes of argument that these materials are

judicial documents and even if we accept the Albuquerque Journal's argument

that a First Amendment analysis should apply to these materials, we still reach the

conclusion that the Journal is not entitled to the relief it seeks.

The First Amendment guarantees the right of the press and the public to

attend criminal trials and certain preliminary proceedings in criminal cases. See

Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13 (1986) ("Press-Enterprise

II"); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603-06 (1982);

Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 575-81 (1980) (plurality

opinion). But, that right is not absolute. Globe Newspaper Co., 457 U.S. at 606.

The Supreme Court has not yet ruled on "whether there is a constitutional

right of access to court documents and, if so, the scope of such a right." McVeigh

II, 119 F.3d at 812. However, this court has rejected the argument that such a

right exists as to certain court documents because providing access to such information would stretch the First Amendment principles and the Supreme Court's analysis in Press-Enterprise II "well beyond their current bounds." Lanphere & Urbaniak v. Colorado, 21 F.3d 1508, 1512 (10th Cir. 1994); see, e.g. McVeigh II, 119 F.3d at 813-14 (rejecting press's request for access to suppressed evidence);  Lanphere, 21 F.3d at 1511-12 (rejecting law firm's commercially motivated request for the names, addresses, and telephone numbers of persons charged with misdemeanor driving offenses); United States v. Hickey, 767 F.2d 705, 709 (10th Cir. 1985) (rejecting defendant's request for sealed plea bargain and court file of his co-conspirator).  The question is whether the materials sought here fall into that category as well.

In Press-Enterprise II, 478 U.S. at 9, the Supreme Court established "tests of experience and logic" to determine whether a First Amendment right of access applies to a particular criminal trial related process.  In McVeigh II, we did not decide whether this court would apply the Press-Enterprise II analysis to media requests for access to court documents, but we assumed without deciding that it did.[12]  McVeigh II, 119 F.3d at 811-12.  We proceed the same way here and

_____

[12]We also noted that "[a] number of circuits have concluded that the logic of Press-Enterprise II extends to at least some categories of court documents and records, such that the First Amendment balancing test there articulated should be applied before such qualifying documents and records can be sealed."  McVeigh
(continued...)

-21-

assume, without deciding, that the Press-Enterprise II analysis applies to these documents.

Under the Press-Enterprise II analysis, the "experience" test examines whether the "place and process have historically been open to the press and general public." Press-Enterprise II, 478 U.S. at 8. The "complementary" test for "logic" asks "whether public access plays a significant positive role in the functioning of the particular process in question" by, for example, "'enhanc[ing] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'"[13] Id. at 8-9 (quoting Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 508 (1984) ("Press-Enterprise I")).

If, applying these tests, a qualified First Amendment right is found to exist, the right may be overcome "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that

---

[12](...continued)
II, 119 F.3d at 811.

[13]The "experience and logic" analysis has not been without its critics. See generally Press-Enterprise II, 478 U.S. at 21-29 (Stevens, J., dissenting); Lillian R. BeVier, Like Mackerel in the Moonlight: Some Reflections on Richmond Newspapers, 10 Hofstra L. Rev. 311 (1982); Eugene Cerruti, "Dancing in the Courthouse": The First Amendment Right of Access Opens a New Round, 29 U. Rich. L. Rev. 237 (1995); Kimba M. Wood, Reexamining the Access Doctrine, 69 S. Cal. L. Rev. 1105 (1996).

a reviewing court can determine whether the closure order was properly entered."

Press-Enterprise I, 464 U.S. at 510. Interests of those other than the accused may

be considered. See Press-Enterprise II, 478 U.S. at 9 n.2 (citing Globe

Newspaper Co., 457 U.S. at 607-10). Since the district court's order separately

addressed the vouchers themselves and all backup and other information, our

Press-Enterprise II analysis proceeds on the same basis.

### a. Backup Documentation, Motions, Orders, and Hearing Transcripts

#### (1) The Experience Test

The Journal has not established and we have not found any general

history—whether prosecution or defense, state or federal judicial system—of

press access to the type of information that the Journal seeks here, or anything

reasonably analogous to it. Of course, the precise information sought here arises

as a result of the passage in 1964 of the Criminal Justice Act, which established a

system for payment of defense services to indigent criminal defendants. Prior to

1964, the private bar provided representation to such defendants without

compensation or payment of such expenses.[14]

---

[14]See Fed. Courts Study Committee at 1.

Obviously, the CJA is too recent in origin to have developed any "history" or "tradition" with respect to press access to documents required by that Act. And, no cases have addressed whether a First Amendment right of access applies to the CJA backup documentation, motions, orders, and hearing transcripts to which the Journal seeks access here. The two courts that have addressed a First Amendment claim of access to CJA vouchers themselves both specifically note that the press did not seek access to the detailed backup material attached to the vouchers. See United States v. Suarez, 880 F.2d 626, 631 (2d Cir. 1989) ("[The newspaper's] request for CJA information is narrow. [It] disavows any entitlement to the work product, trial strategy or privileged communications of defendants or their counsel. . . . [I]t seeks only 'the barebones data' of who was paid, how much and for what services, i.e., only the cover-sheets."); United States v. McVeigh, 918 F. Supp. 1452, 1464 (W.D. Okla. 1996) ("Media counsel have shown their sensitivity to the secrecy required for the defense investigation and trial preparation by restricting their requests to the *amounts* paid out to the attorneys and others providing services to the defense." (emphasis added)).[15]

_____

[15]The only other CJA-related case in which a First Amendment claim was made is United States v. Ellis, 90 F.3d 447 (11th Cir. 1996). There, the Eleventh Circuit affirmed the release of the transcript from a hearing to determine whether the defendant was eligible for an appointed attorney under the CJA. Id. at 449-50. The court did not address whether there was a tradition of access to that type of proceeding, but rather reasoned that because the press has a qualified First

(continued...)

-24-

The Albuquerque Journal argues summarily that the long history of disclosure of attorney's fees where there is a fee-shifting statute in certain civil cases weighs in favor of finding a tradition of disclosure of attorney's fees authorized under the CJA. We disagree. Fee-shifting statutes such as 42 U.S.C. § 1988, are quite different from the situation before us. They do not arise procedurally until after a civil case is completed, so disclosure of trial strategy and violation of Sixth Amendment rights are never a concern. Furthermore, because prevailing parties in these cases seek to obtain money *from the opposing party* to cover fees already incurred, the adversarial process applies so that the paying party may scrutinize and contest the amounts claimed. In the CJA process, on the other hand, the outcome of the litigation is irrelevant, and the defendant is in the position of explaining in advance why certain services are justified, in addition to submitting requests for payment after those services are furnished. Additionally, as we have noted above, the CJA process is non-adversarial. It is the judge who protects the interests of the public fisc in a process that has traditionally been closed to the prosecution. See McVeigh, 918 F. Supp. at 1462; see also United States v. Rodriguez, 833 F.2d 1536, 1538 (11th Cir. 1987) (per curiam). Parties in the civil context may also exclude from their requests for

---

[15](...continued)
Amendment right to attend post-trial proceedings, it has a right to the transcript of the hearing at issue there. Id. at 450.

attorney's fees information that is privileged or attorney work product if the showing is otherwise sufficient, see Gates v. Gomez, 60 F.3d 525, 535 (9th Cir. 1995), or they may seek a protective order to avoid disclosure of that information. See Reed v. Rhodes, 934 F. Supp. 1492, 1502 (N.D. Ohio 1996).

The most one could do is search for some pattern of access or non-access which may have developed in the area. But, as indicated above, there is very little litigation on the subject, and the litigation which exists establishes, if anything, a practice of non-access to CJA backup materials and related information. The record before us discloses nothing which would support the Journal's position as to a tradition of access in the history of this country.

In lieu of any history, tradition or established practice with respect to such materials, we look to the Act and its governing guidelines for whatever insight they may provide, although such a review is obviously not required (and perhaps entirely inappropriate) as part of the "experience" factor of Press-Enterprise II.

The CJA itself specifically provides for ex parte applications and proceedings requesting investigative, expert, or other services necessary for an adequate defense. See 18 U.S.C. § 3006A(e)(1).[16] Likewise, the Administrative

_____

[16]Although the Criminal Justice Act of 1964 has been amended several times, this section was included in the original act. See Criminal Justice Act of 1964, Pub. L. No. 88-455. The legislative history of the Act indicates that this section provided for an ex parte proceeding to "prevent[] the possibility that an
(continued...)

-26-

Office of the United States Courts, under the direction of the Judicial Conference, which pursuant to § 3006A(h), "may, from time to time, issue rules and regulations governing the operation of plans formulated under this section," has provided in its Guide to Judiciary Policies and Procedures:[17]

> *Ex parte* applications for services other than counsel under subsection (e) shall be heard *in camera*, and *shall not be revealed* without the consent of the defendant. The *application shall be placed under seal until the final disposition of the case in the trial court, subject to further order of the court*. Maintaining the secrecy of the application prevents the possibility that an open hearing may cause a defendant to reveal his or her defense.

AO Guide, chap. III, part A, § 3.03 (third and fourth emphases added).

Another section of the Administrative Office Guide instructs that information which is not otherwise routinely available to the public should be made available unless its release might hurt the investigative process or violate certain interests of the defendants, witnesses, or attorneys. Id. at chap. V, § 5.01. However, *CJA documents may be judicially placed under seal "until after all judicial proceedings in the case are completed and for such time thereafter as the court deems appropriate*." Id. (emphasis added).

---

[16](...continued)
open hearing may cause a defendant to reveal his defense." H.R. Rep. No. 88-864 (1963), reprinted in 1964 U.S.C.C.A.N. 2990, 2990.

[17]The Administrative Office Guide was amended slightly after the CJA was amended in 1996 and 1997. The quoted sections are from the Guide as it appeared when the district court was considering the Albuquerque Journal's motion to unseal the CJA documents.

We conclude, therefore, that no history, experience or tradition of access exists as to the release at any time of backup documentation, motions, orders, and hearing transcripts regarding requests for CJA assistance.

This conclusion could end our analysis on the ground, adopted by some courts, that the Press-Enterprise II analysis requires *both* the experience and logic prongs to be satisfied. See, e.g., United States v. El-Sayegh, 131 F.3d 158, 161 (D.C. Cir. 1997); Baltimore Sun Co. v. Goetz, 886 F.2d 60, 64 (4th Cir. 1989). However, we proceed to the logic prong because the procedure here is relatively new. See Seattle Times Co. v. United States District Court, 845 F.2d 1513, 1516 (9th Cir. 1988); see also United States v. Chagra, 701 F.2d 354, 363 (5th Cir. 1983).

### (2)    The Logic Test

As indicated above, the logic test asks whether public access would play a significant positive role in the functioning of the particular process.[18] Press-

_____

[18]In United States v. McVeigh, 106 F.3d 325 (10th Cir. 1997) (per curiam) ("McVeigh I"), we identified six structural interests used by the Supreme Court to determine that a constitutional right of access to criminal trials exists. These interests are identical to those identified by the Third Circuit as "societal interests" cited by the Supreme Court in Richmond Newspapers that are fostered by open court proceedings. See United States v. Simone, 14 F.3d 833, 839 (3rd Cir. 1994). They include: "informing the public discussion of government affairs, assuring the public perception of fairness, promoting the

(continued...)

-28-

Enterprise II, 478 U.S. at 8.  For the reasons set forth below, we conclude that public access to the backup documentation, motions, orders, and hearing transcripts will not play a *significant positive* role in the functioning of the CJA process, and that, in fact, access would play, as in McVeigh II, 119 F.3d at 813, a *negative* role in the process.  In short, logic does not support release of these documents.

Just as the grand jury process is the "classic example" of a government process that would be totally frustrated if conducted openly, see Press-Enterprise II, 478 U.S. at 9 (citing Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218 (1979)), so too would CJA proceedings be frustrated if conducted openly. The CJA process is the defendant's means of preparing a defense, and keeping that process closed will prevent the government from being "tipped off" as to the direction in which the defendant's trial strategy is heading.  See In re Grand Jury Proceedings (Smith), 579 F.2d 836, 840 (3rd Cir. 1978); see also Franks v. Delaware, 438 U.S. 154, 169 (1978).

---

[18](...continued)
community-therapeutic effect of criminal justice proceedings, providing a public check on corrupt practices, intimidating potential perjurers, and generally enhancing the performance of all involved in the process."  McVeigh I, 106 F.3d at 336.  These factors are illustrative, not exclusive, and no one factor controls or predominates.  We evaluate the circumstances in their entirety.

The CJA, which requires that a defendant reveal a high degree of detail about his or her reasons for requesting assistance other than counsel in preparing for trial, see United States v. Kennedy, 64 F.3d 1465, 1470 (10th Cir. 1995); United States v. Mundt, 508 F.2d 904, 908 (10th Cir. 1974), recognizes that confidentiality of that detail is vital to the proper functioning of the CJA process. See Marshall v. United States, 423 F.2d 1315, 1317-19 (10th Cir. 1970); see also Lawson v. Dixon, 3 F.3d 743, 751 (4th Cir. 1993); United States v. Edwards, 488 F.2d 1154, 1160-62 (5th Cir. 1974). Therefore, the CJA provides that the process for requesting assistance other than counsel is to be ex parte, see 18 U.S.C. § 3006A(e)(1), so as not to reveal the strengths and weaknesses of a defendant's case and his or her trial strategy, including possible defenses, witnesses, and evidence to be used at trial. Likewise, the backup documentation to the attorneys' vouchers reveals much of the same information as that contained in requests for services other than counsel, and the same reasons justifying closure of those proceedings apply to the backup documentation.

Another reason grand juries function best in secret is because secrecy "encourage[s] free and untrammeled disclosures by persons who have information." Douglas Oil Co., 441 U.S. at 219 n.10 (quotations omitted). Without an assurance that the information revealed at CJA hearings and in documents submitted to the court will not be disclosed, a defendant and his or her

-30-

counsel would be discouraged from fully disclosing the information to the court. Cf. State v. Ballard, 428 S.E.2d 178, 183 (N.C. 1993) ("Only in the relative freedom of a nonadversarial atmosphere can the defense drop inhibitions regarding its strategies and put before the trial court all available evidence of a need for psychiatric assistance."); United States v. Huckaby, 43 F.3d 135, 138 (5th Cir. 1995) ("Disclosure of [presentence reports] to the public may stifle or discourage that vital transmission of information by the defendants . . . and by cooperating third parties.").

Also, information obtained by the public prior to judgment could influence the jury or prospective jury and would provide the government with "unauthorized discovery which is forbidden under our concept of criminal procedure." Edwards, 488 F.2d at 1162; see Fed. R. Crim. P. 16(b)(2); see also Marshall, 423 F.2d at 1318. And information obtained after judgment could still be used by the government to investigate and bring new charges against a defendant or other individuals, including potential witnesses and other sources of information. These ramifications would ultimately decrease the information the court could use to make a decision, would hinder the court's fact-finding ability, see Grove Fresh Distribs., Inc. v. Everfresh Juice Co., 24 F.3d 893, 897 (7th Cir. 1994) (fostering more accurate fact finding should be a positive role of public scrutiny), and

-31-

would, therefore, impede its ability to correctly decide whether and how much assistance to grant the defendant.

Moreover, much of the information disclosed to the court during the CJA process does not ultimately become part of the criminal trial. A defendant's request for investigative services to look into possible defenses, for example, will not always be fruitful for the defense. Likewise, a defendant's request for funds to interview potential witnesses does not always result in the defendant's use of those witnesses at trial. The danger in disclosing this type of information was manifest in Marshall, 423 F.2d at 1319, where the government learned of the existence of a witness who ultimately testified against the defendant only because the district court had erroneously allowed the government to attend the CJA hearing.

In McVeigh II, 119 F.3d at 813, we held that press access to suppressed evidence would play a *negative* role in the functioning of the criminal process by exposing the public and potential jurors in particular to incriminating evidence not to be introduced at trial. Press access to information disclosed in the CJA process, most of which will not be introduced in the trial, will also play a negative role in the criminal process.

In addition, the CJA process is part of the means by which an indigent defendant obtains discovery. The detail required of the defendant in the CJA

process includes the specific information he expects to find. See Kennedy, 64 F.3d at 1470; Mundt, 508 F.2d at 908. Discovery proceedings are fundamentally different from other proceedings to which courts have recognized a First Amendment right of access. See Anderson v. Cryovac, Inc., 805 F.2d 1, 11-12 (1st Cir. 1986). Therefore, disclosing the information a court considers in making what is essentially a determination of the scope of discovery would make the CJA process more complicated and burdensome. Id. at 12; see also Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32-33 (1984) (holding that party had no First Amendment right to disseminate information obtained by the "legislative grace" of discovery which "may be unrelated, or only tangentially related, to the underlying cause of action").

The Journal emphasizes the positive role access would provide by ensuring the quality of the judge's decision-making, by limiting the potential for abuse by the judge and defense counsel, and by educating the public as to how its money is being spent in criminal defense. Intervenor's First Br. at 14-17. As we have discussed above, we do not believe the judge's decision-making will be improved by an open process, and it may well be hindered. In addition, we point out that the judge's involvement in the process *is* the protection against corruption, as opposed, for instance, to expenditures by the prosecution and Federal Public Defenders Offices which in the detail sought here, are not subject to judicial

-33-

supervision *or* public scrutiny. We see little reason to believe that "public scrutiny" would sway these types of rulings by the court.

Obviously, disclosure would provide some information to the public, but we agree with the Ninth Circuit that "[w]ere we to accept this argument, few, if any, judicial proceedings would remain closed. Every judicial proceeding, indeed every governmental process, arguably benefits from public scrutiny to some degree, in that openness leads to a better-informed citizenry and tends to deter government officials from abusing the powers of government." Times Mirror Co. v. United States, 873 F.2d 1210, 1213 (9th Cir. 1989). Yet, "because the integrity and independence" of proceedings such as the grand jury, jury deliberations, and the internal communications of the court "are threatened by public disclosures, claims of 'improved self-governance' and 'the promotion of fairness' cannot be used as an incantation to open these proceedings to the public." Id.

The Albuquerque Journal's "information" arguments would apply to every governmental process, including those of the executive branch, where the Supreme Court has extended no First Amendment right of access. See El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 494-95 (1st Cir. 1992); see, e.g., Calder v. Internal Revenue Serv., 890 F.2d 781, 783-84 (5th Cir. 1989) (denying First Amendment right of access to IRS records held by that agency); Capital Cities Media, Inc. v. Chester, 797 F.2d 1164, 1175-76 (3d Cir. 1986) (denying First

Amendment right of access to records of state agency). Indeed, there is no First Amendment right of access to government processes in general. See Houchins v. KQED, Inc., 438 U.S. 1, 14-15 (1978). And although Congress can choose to open some of those processes, Justice Stewart has commented that the "Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act." Id. at 15 (quoting Stewart, Or of the Press, 26 Hastings L.J. 631, 636 (1975)); see also In re Motions of Dow Jones & Co., 142 F.3d 496, 502 (D.C. Cir. 1998) ("The Chief Judge can allow some public access [to grand jury-related matters, b]ut it will be done because the Federal Rules of Criminal Procedure confer this authority on district courts, not because the First Amendment demands it.").

Moreover, the linchpin of the Albuquerque Journal's claim to a First Amendment right of access is that judicial discretion has been applied. Yet, in many contexts, courts have rejected a constitutional right of access where judicial discretion has been applied, even in proceedings relating to the guilt or innocence of the defendant and even though the public would have been educated and the participant's actions would have been checked. These include: presentence reports relied on by the court in making a sentencing decision, United States v. Corbitt, 879 F.2d 224, 229-30 (7th Cir. 1989); pre-indictment search warrant affidavits used by the court in considering search warrant applications, Baltimore

-35-

Sun Co. v. Goetz, 886 F.2d 60, 64-65 (4th Cir. 1989); Times Mirror Co., 873 F.2d at 1218; documents considered by the court in ruling on civil discovery motions, Cryovac, Inc., 805 F.2d at 11-12; grand jury proceedings and ancillary proceedings or documents related thereto, In re Motions of Dow Jones & Co., 142 F.3d at 498-99, 502-03; and evidence actually ruled inadmissible by the court in suppression hearings, McVeigh II, 119 F.3d at 813.[19]  In the instant case, the CJA process is not even a preliminary process relating to the guilt of the defendant, nor does the information contained in the CJA documents relate to the core proceeding—the determination of the guilt or innocence of the defendant.

As an alternative argument, the Journal contends that the process will not be hindered if the court selectively redacts any information that may hurt the process.  Intervenor's Third Br. at 13-14.  After reviewing many of the materials contained in the record of this case, we disagree.  The hearing transcripts, motions, orders, and backup documentation are replete with sensitive information, the release of which would harm the CJA process as discussed above.  The public has an interest not only in the way its funds are used but also in seeing that judicial processes are efficient and that defendants are given the "'basic tools'"

---

[19]We recognize that the courts are not in complete harmony on all of these judicial proceedings.  See, e.g., In re Search Warrant for Secretarial Area Outside Office of Gunn, 855 F.2d 569, 572-75 (8th Cir. 1988) (holding qualified First Amendment right of access applies to search warrant affidavits, but interests weigh in favor of non-disclosure).

and "'raw materials integral to'" the presentation of an adequate defense so as to ensure a fair trial. See Kennedy, 64 F.3d at 1473 (quoting Ake v. Oklahoma, 470 U.S. 68, 76 (1985)).

Requiring the release of the requested materials would entail an extensive—not to mention expensive—use of court and counsel effort by forcing counsel to be more careful in the information presented to the court for fear of future disclosure and by forcing the court and counsel to ensure that most of the information in the CJA materials is ultimately redacted. Cf. In re Search Warrant for Secretarial Area Outside Office of Gunn, 855 F.2d at 574-75 (holding that even where the First Amendment right of access applied, line-by-line redaction of the sealed documents was not practicable, and thus not required); see also Seattle Times Co., 476 U.S. at 36 n.23; Cryovac, Inc., 805 F.2d at 12. Especially in a high profile case like this one, effective, efficient, and fair procedures must be employed. See McVeigh II, 119 F.3d at 813. Access only to those portions of the materials that do not contain the implicated information would be a Pyrrhic victory for access, with little benefit to the functioning of the system. See Cryovac, Inc., 805 F.2d at 12.

In sum, neither experience nor logic lead us to conclude that there is a First Amendment right of access to CJA-related backup documentation, motions, orders, and hearing transcripts.

**b.   CJA Vouchers**

We find it unnecessary to address whether there is a constitutional right to the vouchers themselves because the district court's order already requires release of the vouchers—a decision we uphold on other grounds discussed below.  As we said at the outset of this discussion, we avoid deciding cases on constitutional grounds if they can be resolved on another basis.  Since the Journal already has the relief it seeks as to disclosure in general, any opinion on constitutional grounds would be merely advisory.[20]

This conclusion still leaves unanswered the Journal's arguments with respect to the timing of the vouchers' release.  It is the Journal's position that access to the vouchers at the end of trial is not enough—immediate access is required.  We disagree.  In our view, there is no constitutional right in this case to timing as opposed to access itself.  Here, the Defendants are represented by CJA attorneys, who handle only a minority of the total criminal caseload, and of that minority, only a minority of all CJA attorneys submit vouchers on an interim basis, so, at best, we are dealing with a fraction of a fraction of cases.  Further,

---

[20]The CJA has recently been amended so as to specifically address the issue of access to the vouchers and to specify the timing of that access.  See infra note 21 and accompanying text.  Therefore, any ruling here would be of limited import in any case because this statute is now in effect and makes constitutional analysis unnecessary.  More to the point, it takes the issue here out of the "capable of repetition yet evading review" category.  Any future argument by the Journal will necessarily begin with an analysis of the amended statute.

we must observe that while vouchers are required to be submitted, they are not required to be submitted on an interim basis. Thus, it is fortuitous that here the vouchers have been submitted on an interim basis, which depends to a large extent on the attorneys' financial strength. Certainly, the Journal could not argue that the First Amendment would compel CJA attorneys to *submit* vouchers on an interim basis because there is a constitutional right to *immediate* access to accruing data, as opposed to access itself.

To support its timing argument, the Journal relies on United States v. Suarez, 880 F.2d 626 (2d Cir. 1989), where the Second Circuit upheld on First Amendment grounds a district court order permitting the press access to interim vouchers. We think Suarez is distinguishable. In that case, the district court's order only addressed present access to interim vouchers. No order existed allowing access to vouchers at the end of trial, and the district court was not called upon and did not address the interim voucher issue in such a context. Thus, the Second Circuit's review was limited, and there is no way to discern from the opinion how much the reasoning was driven by the subject of access itself, and how much significance, if any, the court placed on timing. In short, we do not know how the Second Circuit would have ruled if faced with a situation like that before us, where the district court has already ordered release of the vouchers at the end of the proceedings.

Likewise, we find the Journal's reliance throughout its briefs on <u>United States v. McVeigh</u>, 918 F. Supp. 1452 (W.D. Okla. 1996), contrary to its position with respect to timing. There the court never made clear whether it found a qualified First Amendment right or whether it based its decision on the common law, <u>see</u> <u>McVeigh</u>, 918 F. Supp. at 1464, but its conclusion was that interim vouchers should not be released. <u>Id.</u> at 1465.

If we were to apply the experience and logic test to the issue of *immediate* access to the vouchers, it is clear for all the reasons stated earlier in this opinion, and more, that it would fail. In the end, we agree with the <u>McVeigh</u> court that revealing the amounts of interim payments is not a reasonable alternative to full disclosure because it would "distort the public perception about the fairness of the process because the expenditures, out of context, would emphasize costs without any information about benefits obtained." <u>Id.</u> at 1465.

**B.      Common Law Access and the CJA Statutory Scheme**

The Albuquerque Journal argues that even if we do not find a First Amendment right of access, all of the CJA materials should still be unsealed pursuant to the common law and/or the CJA statutory scheme. We reject the Journal's common law argument for two reasons. First, the statute and regulations discussed below occupy this field and would supercede the common

-40-

law right even if one existed.  See United States v. Texas, 507 U.S. 529, 534 (1993); see also In re Motions of Dow Jones & Co., 142 F.3d 496, 504 (D.C. Cir. 1998) (common law right of access to grand jury-related information is supplanted by Fed. R. Crim. P. 6(e)(5), 6(e)(6)); Lanphere & Urbaniak v. Colorado, 21 F.3d 1508, 1511 (10th Cir. 1994) (common law right of access to criminal justice records is supplanted by Colorado statute).  Second, as we have discussed above, the CJA materials are not "judicial documents" as that term is used by courts that have applied the common law right of access.  Rather, these are administrative documents, see United States v. Davis, 953 F.2d 1482, 1498 n.21 (10th Cir. 1992), to which there is no right of access under the common law. We therefore analyze to what extent the materials should be released under the CJA.

The CJA was enacted in 1964 "to insure effective representation for those charged with a crime or confronted with the risk of being deprived of constitutional rights in ancillary proceedings."  United States v. Smith, 633 F.2d 739, 741 (7th Cir. 1980) (citing H.R. Rep. No. 91-1546 (1970), reprinted in 1970 U.S.C.C.A.N. 3982, 3983); see also United States v. Edwards, 488 F.2d 1154, 1161-62 (5th Cir. 1974).  To achieve its purpose, the CJA provides for both representation by counsel and "other services necessary for adequate representation."  18 U.S.C. § 3006A(e)(1).

The version of the statute in effect for this case provides that the Judicial Conference of the United States "may, from time to time, issue rules and regulations governing the operation of plans formulated under this section." 18 U.S.C. § 3006A(h). Accordingly, the Administrative Office, under the direction of the Judicial Conference, has promulgated rules relating to the release of all types of CJA information. See AO Guide, chap. III, part A, § 3.03; chap. V, § 5.01. The AO Guide includes the forms to be used in conjunction with the CJA process, including forms 20, 21, 30, and 31 discussed above. We apply the version of the AO Guide applicable to this case in our discussion below.

Under the statute and regulations, the information related to counsel's fees is presumptively accessible to the public. It may be sealed at the discretion of the district court upon motion of the defendant or on the court's own motion. Similarly, this information that is placed under seal may be released later at the court's discretion, after consideration of the interests discussed below. To the contrary, information pertaining to the application for services other than counsel is sealed from the outset. After trial, the court has the discretion, after finding on the record that the same interests are protected, to release this information as well.

Although the CJA has been amended twice since the present case was commenced and both amendments have altered the provisions for access to CJA

vouchers,[21] the amendments essentially codify the regulations.  However, one

---

[21]The Judiciary Appropriations Act of 1998, Pub. L. No. 105-119, § 308, applies, pursuant to the Act, to cases filed on or after January 25, 1998.  This amendment provides that compensation paid to *counsel* should be disclosed to the public upon approval by the court.  Any detailed information on vouchers submitted prior to the end of trial is to be redacted, and in any case, the court must consider Fifth and Sixth Amendment rights, the attorney-client privilege, the work product privilege, safety of any person, and any other interest justice may require in deciding what portions of the vouchers to release.  The amendment also provides that the compensation paid to counsel should be categorized essentially as it currently is on CJA form 20.  See form 20, attached hereto; 18 U.S.C. § 3006A(d)(4).

Prior to the most recent amendment, the CJA was amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 108, 903, which also amended 21 U.S.C. § 848(q) pertaining to death penalty representation, and applies to cases commencing on or after April 24, 1996.  This amendment provides that "[t]he *amounts* paid" for representation by counsel and for other services "shall be made available to the public."  18 U.S.C. § 3006A(d)(4), (e)(4) (emphasis added).  The subsequent amendment discussed above replaced this language as to counsel only.

Although the version of the CJA applicable to this case does not include either of these amendments, they are instructive in that they indicate a shift toward increased access to the amounts paid out under the CJA.  However, they are equally informative in that they do not indicate a legislative desire to release the other CJA information which the Albuquerque Journal is seeking here.  The legislative history of the amendments indicates that the change was intended to reach the *amounts* listed on the CJA vouchers, but not the backup documentation or other CJA-related documents.  Senator Domenici, who introduced the language in the most recent amendment, discussed the backup documents and the great amount of detail that they contain.  He then stated, "clearly if this information were subject to public disclosure the alleged criminal's sixth amendment rights might be compromised.  My bill does not seek to make this sensitive information subject to public disclosure, but rather continues to leave it to the Judge to determine if and when it should be released."  143 Cong. Rec. S8069-70 (daily ed. July 24, 1997) (statement of Sen. Domenici).  While we recognize that statements

(continued...)

-43-

amendment specifically provides that amounts expended under the CJA "shall be made available to the public," 18 U.S.C. § 3006A(e)(4), which apparently takes the discretion away from the district court as to the release of the totals. In death penalty cases, the amounts are to be made available to the public "after the disposition of the petition." 21 U.S.C. § 848(q)(10)(C). In addition, one of the amendments, applicable only to death penalty cases, changes the presumption from an ex parte hearing for services other than counsel to a process which is not to be held ex parte "unless a proper showing is made concerning the need for confidentiality." 21 U.S.C. § 848(q)(9). Our interpretation of the statute in effect for this case is consistent with the amendments, except as those amendments alter access to CJA information in death penalty cases.

### 1. Motions, Orders, and Hearing Transcripts Related to the Retention and Compensation of Services Other Than Counsel

Services other than counsel that are necessary for adequate representation may be obtained by a defendant who is financially unable to obtain them, upon an ex parte application, heard by the court in camera. See 18 U.S.C. § 3006A(e); AO Guide, chap. III, part A, § 3.03. The application, which is *not* a voucher but is

---

[21](...continued)
like this are not conclusive or binding, we find it informative that our independent review of the amendment is consistent with the drafter's view.

usually an ex parte motion followed by an ex parte hearing, "shall not be revealed without the consent of the defendant. The application shall be placed under seal until the final disposition of the case in the trial court, subject to further order of the court. Maintaining the secrecy of the application prevents the possibility that an open hearing may cause a defendant to reveal his or her defense." Id. § 3.03. Similar procedures are provided in death penalty cases under the version of the statute applicable to this case. See 21 U.S.C. § 848(q)(9).

The legislative history of the act indicates that the need for secrecy in obtaining services other than counsel is to prevent "the possibility that an open hearing may cause a defendant to reveal his defense." H.R. Rep. No. 88-864 (1963), reprinted in 1964 U.S.C.C.A.N. 2990, 2990; see also Marshall v. United States, 423 F.2d 1315, 1318 (10th Cir. 1970). Because the Defendants are "act[ing] jointly, sharing responsibility for motions and investigation and attending joint strategy sessions . . . to avoid duplicative efforts and to minimize expenses," United States v. Gonzales, No. CR-95-538-MV, 1997 WL 155403, at *12 (D.N.M. Feb. 11, 1997), the release of any CJA documents prior to the last Defendant's sentencing would prejudice that Defendant by causing him "to reveal his defense." H.R. Rep. No. 88-864 (1963), reprinted in 1964 U.S.C.C.A.N. 2990, 2990. Thus, we reject the Albuquerque Journal's argument that materials

-45-

related to services other than counsel should be released prior to the end of all Defendants' sentencing hearings.

The district court, however, because it found a First Amendment right of access, ordered that all CJA-related documents, motions, orders, and hearing transcripts be released after the last remaining Defendant is sentenced. Pursuant to the CJA statutory and regulatory scheme, we conclude that this information is presumptively closed. The scheme favors continuing confidentiality of the information, and given the interests identified in the discussion of the logic prong of the constitutional analysis above, we conclude that the district court abused its discretion in ordering that the motions, orders, and hearing transcripts related to services other than counsel be released.

### 2. Materials Related to the Appointment and Compensation of Counsel and the Backup Documentation to Vouchers for Services Other Than Counsel

The CJA provides that appointment of counsel is to be achieved after determining that the defendant is financially unable to obtain counsel pursuant to a plan implemented by each district court. See 18 U.S.C. § 3006A(b). Similar procedures apply to death penalty cases. See 18 U.S.C. § 3005; 21 U.S.C. § 848(q)(4)-(8), (10). Neither the statute nor the Administrative Office's rules specify whether this procedure is to be done ex parte.

Section 5.01 of the AO Guide changes the presumption from one of secrecy in non-attorney retention and compensation to one of openness for information not otherwise routinely available to the public, while still giving the court the discretion to place CJA-related materials under seal "until after all judicial proceedings[22] in the case are completed and for such time thereafter as the court deems appropriate." This section of the AO Guide also applies to the backup documentation to the vouchers for services other than counsel.[23] Information should be released unless "its release might . . . unduly intrude upon the privacy of attorneys or defendants or compromise defense strategies, investigative procedures, attorney work product, the attorney-client relationship or privileged information provided by the defendant or other sources." Id.

In our discussion of the logic prong of the Press-Enterprise II analysis above, we considered several of these factors, concluding that access to CJA materials, including backup documentation to CJA forms 20, 21, 30, and 31, and motions, orders, and hearing transcripts related to the appointment of counsel, would not play a significant positive role on the functioning of the CJA process. In addition to those factors discussed above, we conclude that the other factors

[22]The current version of the AO Guide, which is not applicable to this case, clarifies that "all judicial proceedings" includes appeals.

[23]We do not believe that § 5.01 changes the presumption in favor of sealing materials related to the ex parte process for *obtaining* services other than counsel as provided in the statute, 18 U.S.C. § 3006A(e) and the AO Guide, § 3.03.

also favor continued sealing of these CJA materials, even after sentencing is completed.

The district court considered several of these other factors, but did so in the context of its Press-Enterprise II analysis of "higher values." First, the district court found, and we agree, that allowing disclosure of the backup documentation to the attorneys' requests for compensation may "subject innocent people who have been interviewed or investigated by Defendants to public speculation about their involvement in the crime." Gonzales, 1997 WL 155403, at *8. This interest is similar to one justification for keeping grand jury proceedings secret even after trial is over. See Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 219 (1979); see also United States v. Corbitt, 879 F.2d 224, 231 & nn.8-9 (7th Cir. 1989); Times Mirror Co. v. United States, 873 F.2d 1210, 1216 (9th Cir. 1989).

In addition, several witnesses are in the Witness Protection Program, and information, such as the places to which defense counsel have traveled, which could reveal their location should not be disclosed. See United States v. Hickey, 767 F.2d 705, 708 (10th Cir. 1985); cf. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607-08 (1982). Non-witnesses also have a privacy interest in retaining anonymity for similar safety reasons. We disagree, therefore, with the district court's apparent conclusion that a non-defendant's privacy interest is only valid until the "conclusion of litigation." Gonzales, 1997 WL 155403, at *8.

-48-

Second, release of the backup documentation, motions, orders, and hearing transcripts related to the appointment and compensation of counsel and of the backup documentation to vouchers for services other than counsel will intrude on the privacy interests of the Defendants and will reveal privileged information provided by the Defendants. As discussed above, disclosure of this CJA information may implicate the Defendants' Fifth Amendment rights as to the instant crime. It may also put the government "in a position to investigate and bring new charges against [defendants who inculpate themselves in uncharged criminal conduct in order to obtain an adequate defense]." Supplemental R. Vol. I, Tab 2073 at 5 n.1 (district court order granting in part defendants' motion to stay pending appeal). These privacy interests also do not cease at the conclusion of the litigation.

Third, unsealing the backup documentation, motions, orders and hearing transcripts related to the appointment and compensation of counsel and the backup documentation to vouchers for services other than counsel would reveal information protected by the attorney-client privilege and by the attorney work-product doctrine. In addition to the attorney being reluctant to provide the court with information necessary to obtain services for the defense as discussed

above,[24] the specter of the release of detailed backup documentation to the attorney's vouchers and non-attorney's vouchers, which, the district court found, "often contain information directly or indirectly implicating the attorney-client privilege," would make a defendant "reluctant to reveal information that could help the attorney in the defense of the case, or in analyzing the strength of the case for trial."[25] Gonzales, 1997 WL 155403, at *8; see Crystal Grower's Corp. v. Dobbins, 616 F.2d 458, 461 (10th Cir. 1980). The importance of this privilege and doctrine is well-established, see Upjohn Co. v. United States, 449 U.S. 383, 389-92 (1981), a point which the Supreme Court just recently reemphasized in holding that the attorney-client privilege extends beyond the death of the client. See Swidler & Berlin v. United States, No. 97-1192, — S. Ct. —, 1998 WL 333019, at *3-7 (U.S. June 25, 1998). Certainly, then, the privilege does not terminate when the Defendants' trials are over.

Accordingly, we conclude that the district court abused its discretion in ordering that the backup documentation, motions, orders and hearing transcripts

_____

[24]We also point out that potential disclosure of the information *while the trial is still pending* would encourage defense counsel to wait until the trial is over before submitting vouchers for compensation. In complicated cases such as death penalty prosecutions, where "[i]t is urged that the court permit interim payment of compensation," AO Guide, chap. VI, § 6.02(C), such a choice to be made by counsel is yet another disadvantage indigent defendants face.

[25]Disclosure of work product and privileged information would also give the government information as to the methods particular defense counsel use in combating prosecutions.

related to the appointment and compensation of counsel and the backup

documentation to vouchers for services other than counsel should be unsealed

after the conclusion of all Defendants' sentencing hearings.

### 3. Vouchers and Total Expenditures

Finally, we address the district court's order that the total attorney fees and

overall total paid through CJA funds be released for each Defendant after that

Defendant is sentenced and that all of the vouchers themselves (without the

backup documentation) be released at the end of all Defendants' sentencing

hearings. The district court found that because the vouchers (forms 20, 21, 30,

and 31) themselves contain trial strategy, Gonzales, 1997 WL 155403, at *7,

release of the entire vouchers prior to the conclusion of all Defendants' trials

would harm Defendants not yet tried. The court considered the interests involved

and properly applied its discretion to release the total amount spent on counsel

and the total amount spent overall on each Defendant at the end of that

Defendant's sentencing hearing and to save the release of the vouchers

themselves until all Defendants' sentencing hearings are completed. We find no

abuse in the court's conclusion that forms 21 and 31, relating to the compensation

of experts, investigators, and others, contain trial strategy. Although we question

how much trial strategy is revealed on forms 20 and 30 regarding compensation to

counsel, we cannot say the court abused its discretion in waiting to release them until the end of all sentencing hearings since the forms themselves require the attorneys to specify certain information, which could reveal strategy.[26]

The district court's order that the vouchers should ultimately be released is also consistent with the two recent amendments to the CJA, which require that the *amounts* expended for counsel and other services under the CJA be disclosed. See supra note 21. The most recent amendment provides that the amount paid to counsel is to be divided into twelve categories, which roughly match the

_____

[26]There is no disagreement between us and the dissenting opinion on the proposition that there is a presumption of openness with respect to the cover sheets, at least as to counsel fees. See supra p. 47. This presumption has long been in the Guidelines and has been codified by amendments to the CJA effective January 25, 1998. See supra note 21. But the presumption is only the beginning of the analysis. Both the cited Guidelines and the amended statute contain a laundry list of items which can override the presumption. Overarching the presumption and these conditions is the proposition that the determination whether to disclose immediately or to defer disclosure, whether in redacted or unredacted form, is a matter of discretion for the trial judge. There are sound reasons for this, which are especially apparent in this case. The trial judge is in a position to evaluate at first hand the costs and benefits associated with disclosure or deferred disclosure. The case before us is particularly illustrative because of the number of defendants, the fact that some are testifying against others, the fact that the court has ordered the defendants to share certain information and otherwise work with one another, and, in general, the extraordinary size of these proceedings. This case presents a perfect example of the appellate court's responsibility to respect its standard of review in cases involving discretionary judgment calls by the district court. Obviously, if we were exercising a de novo standard of review, we might come to a different conclusion than did the trial judge. But our review is necessarily deferential, and we should be slow to second-guess the trial judge's prerogative in a matter this complex. It is this latter point where, we believe, the dissent misses the mark.

categories presently on CJA forms 20 and 30, to be released pursuant to the court's order. Therefore, all of the vouchers may properly be disclosed, without the backup documentation, at the end of the last Defendant's sentencing hearing, in accordance with the district court's order. And as the district court has made clear, its order has not foreclosed the Defendants from seeking a protective order with regards to sensitive information that may be contained on the vouchers themselves. See Supplemental R. Vol. I, Tab 2073 at 6 n.2 (district court order granting in part defendants' motion to stay pending appeal).

Finally, even if we were to assume that a qualified First Amendment right applied to the vouchers as the Second Circuit held in Suarez, 880 F.2d at 631, the interests we have already identified, and that the district court balanced, lead us to agree with the district court's narrowly tailored conclusion that the vouchers should remain sealed until all Defendants are sentenced, except for the total amount paid to the attorney and the total amount spent overall, which will be released at the conclusion of each Defendant's sentencing hearing.

## III.

### CONCLUSION

We GRANT a writ of mandamus on the cross-appeals and DENY a writ of mandamus on the appeal. We VACATE that portion of the district court's order

which releases the backup documentation, motions, orders, and hearing transcripts. That portion of the district court's order which releases CJA forms 20, 21, 30, and 31, without accompanying backup documentation, at the conclusion of the last Defendant's sentencing hearing, unless interests favor keeping the forms sealed until after any direct appeals, shall remain in force. In addition, that portion of the district court's order releasing, upon completion of each Defendant's sentencing, the total amount paid to that Defendant's attorney and the total amount spent overall for that Defendant shall remain in force.

All outstanding motions are DENIED.

Attachments not available electronically.

Nos. 97-2064, 97-2095, 97-2101, <u>United States v. Gonzales</u>

**BRISCOE**, Circuit Judge, concurring and dissenting:

I agree there is no First Amendment right of access to CJA documents because they are administrative in nature,[1] and that any common law right of access was preempted by the CJA. I also agree that under the CJA and rules promulgated under it, the district court should not have ordered that the backup documentation, motions, orders, and hearing transcripts be unsealed at the conclusion of all defendants' sentencing hearings.[2] However, I do not agree that the district court could properly keep the CJA forms and the amounts paid for counsel and other services sealed until the conclusion of each defendant's trial.

The version of § 5.01 of the guide to Judiciary Policies and Practices in effect when this case commenced governs "Procedures for the Release of Information Pertaining to Criminal Justice Act Activities," and provides:

> *Generally, such information which is not otherwise routinely available to the public should be made available unless* it is classified pursuant to an executive order or *its release might* adversely affect the national defense or foreign policy interest of the United States, *unduly intrude upon the privacy of attorneys or defendants or compromise defense strategies, investigative*

---

[1] However, I question the majority's alternative conclusion that, even if CJA documents are judicial rather than administrative in nature, there would be no First Amendment right of access to them. <u>See</u> <u>United States v. Suarez</u>, 880 F.2d 626 (2d Cir. 1989).

[2] I question whether they must remain sealed in perpetuity. At some point, after appellate and post-conviction review is over, the interests served by keeping the materials sealed may no longer justify denial of access.

*procedures, attorney work product, the attorney-client relationship or privileged information provided by the defendant or other sources* (see 5 U.S.C. § 552(b)).

Upon request, or upon the court's own motion, documents pertaining to Criminal Justice Act activities maintained in the clerk's open files, which are generally available to the public, may be judicially placed under seal or otherwise safeguarded until after all judicial proceedings in the case are completed and for such time thereafter as the court deems appropriate. Interested parties should be notified of any modification of such an order.

Under § 5.01, CJA information is presumptively available unless the court concludes it should be sealed to avoid undue intrusion upon the privacy of attorneys or defendants, compromise defense strategies, investigative procedures, attorney work product, the attorney-client relationship, or privileged information. CJA voucher forms for attorney services specify the hours claimed for generic categories of services: interviews and conferences, obtaining and reviewing records, legal research and brief writing, travel time, and investigative and other work. I do not see how disclosure of this basic information during trial could intrude upon privacy or compromise defense strategies, investigative procedures, attorney work product, the attorney-client relationship, or privileged information. See United States v. Suarez, 880 F.2d 626, 631-32 (2d Cir. 1989). The categories of work delineated on the CJA voucher form are commonplace to all criminal defense work. To reveal that defense counsel had worked for a certain number of hours interviewing witnesses, obtaining records, researching, writing briefs, traveling, and investigating would only confirm what anyone familiar with

criminal defense work would expect.

Disclosure of the fees and the number of hours expended would not be so shocking to the public that defense counsel would be castigated to such a degree that the ability to defend their clients would be impaired. While disclosure of fees during the proceedings might fuel controversy, this litigation shows that keeping fee information sealed has in fact caused controversy. The public might be outraged at the amount of fees paid for the legal defense of persons charged with crimes, but might be equally outraged at being denied access to that information. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13 (1986). Because there is no reason to deny access to this basic information, it is an abuse of discretion to keep it under seal during trial.

Disclosure of unredacted CJA voucher forms for expert and other services during trial could compromise defense strategies by revealing the types of experts consulted and their names. However, the forms could easily be redacted by deletion of the types and descriptions of services requested, the names of experts, and any other identifying information. See Suarez, 880 F.2d at 631-32. There is no reason to keep the amounts paid for expert and other services sealed during trial.

I would grant the Journal's petition for writ of mandamus in part and vacate that portion of the district court's order keeping CJA voucher form cover sheets sealed during trial.