UNITED STATES of America,
Plaintiff,

v.

Cathy LEXIN (2) Teresa Webster
(3), Defendants.

No. C 06 CR 0043 BEN.

United States District Court,
S.D. California.

May 22, 2006.

U.S. Attorney, U.S. Attorney's Office, San Diego, CA, for Plaintiff.

ORDER GRANTING DEFENDANTS LEXIN'S AND WEBSTER'S REQUESTS FOR APPOINTMENT OF COUNSEL; ORDER GRANTING IN PART AND DENYING IN PART COPLEY PRESS' MOTION FOR EMERGENCY INTERVENTION (20–1); ORDER GRANTING DEFENDANTS LEXIN'S AND WEBSTER'S MOTION TO SEAL PERSONAL FINANCIAL INFORMATION SUBMITTED IN SUPPORT OF REQUESTS FOR APPOINTMENT OF COUNSEL (24–1)

PAPAS, United States Magistrate Judge.

On January 6, 2006 five individuals formerly involved with the San Diego City Employees' Retirement System ("SDCERS") were indicted by a federal grand jury in the Southern District of California. Two of the defendants, Cathy Lexin ("Lexin") and Teresa Webster ("Webster") or ("Defendants"), seek appointment of counsel pursuant to 18 U.S.C. § 3006A. They also request that the financial information they have submitted to the Court in support of their Applications be sealed on the basis of their rights to privacy.

This opinion addresses three separate issues relative to the Applications for Appointment of Counsel. First, whether Lexin and Webster are eligible for appointment of counsel pursuant to 18 U.S.C. § 3006A. Second, whether the financial information submitted in support of the applications should be sealed. Third, whether the press has standing to intervene in the case or otherwise participate in the dialogue regarding the request by Lexin and Webster to seal the financial documentation related to their request.

For the reasons stated below, the Court finds each Defendant eligible for appointment of counsel pursuant to 18 U.S.C. § 3006A, grants Defendants' Motion to Seal the Financial Information submitted in support of their Requests for Appointment of Counsel, and finds the press has standing to participate in the proceedings before the court relative to public access to court records.

*Relevant Factual and Procedural Background*

A twenty count indictment charges five defendants, including Lexin and Webster, with conspiracy to commit honest services wire and mail fraud in violation of 18 U.S.C. § 371, honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, and honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346. The indictment covers a time frame going back nearly ten years, describes and involves actions and activities of SDCERS, various members of the City Council for the City of San Diego, panels and committees related to and appointed by the Mayor of the City of San Diego and the City Council and other individuals and municipal agencies. In particular, the following matters are pending and involve both Lexin and Webster:

(1) *People v. Lexin,* San Diego Superior Court Case No. CD190930. In this case, both Defendants are named along with five co-defendants. This is a criminal case alleging violation of California Government Code § 1090 (Conflict of Interest). The preliminary hearing in the case resulted in the Defendants being bound over for trial. Trial will be lengthy.

(2) *People v. Grissom,* San Diego Superior Court Case No. GIC850246. Both Defendants are named in this civil case brought by the San Diego

City Attorney. Hearings are pending in this action.

(3) *SDCERS v. Aguirre,* (and related cross-actions), San Diego Superior Court Case No. GIC841845. This case was originally a civil action brought by SDCERS challenging certain conduct of the San Diego City Attorney and has now been consolidated with a second lawsuit. The City Attorney, and now the City, have cross-complained.

(4) *San Diego Police Officers' Association v. Aguirre,* Case No. 05–CV–1581–H(POR). This is a federal civil action brought on behalf of the San Diego Police Officers' Association raising numerous state and federal claims against the San Diego City Attorney, the Retirement System and numerous individuals, including Defendants Lexin and Webster. The matter is pending before District Judge Huff.

(5) *Torres v. City of San Diego,* San Diego Superior Court No. GIC852293. This action was brought by plaintiffs, including Defendants Lexin and Webster, against the City of San Diego for declaratory relief and indemnification of attorney fees in the civil actions. The City of San Diego has declined to support Defendants' requests to the City for attorney fees or costs.

(6) *SEC Investigation IA–14A.* The Securities and Exchange Commission is investigating bond disclosures with regard to the issuance of bonds by the City of San Diego in the years 2002 and 2003. It is the position of the SEC that certain City officials and City employees may have been negligent and/or reckless with regard to omissions and/or misrepresentations in bond disclosure footnotes as they pertain to the pension system. Defendants Lexin and Webster have been notified that they are potential defendants. The Court has been in-formed that the San Diego City Attorney has indicated that the City will pay attorney fees for Defendants Lexin and Webster regarding the SEC investigation. However, to the Court's knowledge and to date, no attorney fees have been paid.

In addition to the above mentioned cases in which these Defendants are named parties, there are numerous other cases pending in San Diego Superior Court in which both Lexin and Webster are potential witnesses and/or parties. These cases are:

(1) *City of San Diego v. Murphy, Zucchet and Inzunza* (GIC854373);

(2) *McGuigan v. City of San Diego* (GIC849883);

(3) *City of San Diego v. Callan Associates, Inc.* (GIC 852419);

(4) *Newsome v. SDCERS* (GIC856841);

(5) *City of San Diego v. Orrick, Harrington and Suchlift, et al.* (GIC857632);

(6) *Abdelnour v. City of San Diego* (GIC852110).

During argument before this Court on the issue of eligibility for appointed counsel, attorneys for both Lexin and Webster proffered that future attorney fees and costs for the above litigation is likely to exceed 1.5 million dollars excluding indemnification which issue has not yet been resolved.

On February 1, 2006, this Court ordered Lexin and Webster to submit CJA Form 23 affidavits in support of their Requests for Appointment of Counsel. At that time, defense counsel requested that the Form 23 be sealed. All financial submissions from Defendants were provisionally sealed pending a hearing on the request. On February 14, 2006, the Copley Press ("Copley") moved to intervene, seeking access to all court records in the case, which unavoidably put Copley on a collision

course with Defendants' sealing requests. Thereafter, on March 14, 2006, additional briefing was ordered on issues surrounding which assets of the Defendants or their families the court could consider in assessing Defendants' eligibility for appointed counsel. All parties submitted briefing on the various issues before the court and argument was heard by the Court on April 17, 2006

*Eligibility for Appointed Counsel* [1]

As part of its evaluation, the Court reviewed each Defendant's original Form 23 and supplemental sealed financial affidavits and requested that the Defendants and government address three issues [2]: (1) whether separate assets of Defendants' spouses, (2) what part, if any, of Defendants' community property assets, and, (3) whether Defendants' individual retirement accounts, could be considered by the Court in determining Defendants' eligibility for appointed counsel.

Defendants argue that eligibility for appointed counsel should be made without regard to assets of their spouses, if the spouses are unwilling to contribute to the Defendants' costs of defense in this case. Further, Defendants argue that certain community property assets of Defendants and their spouses cannot be used to determine eligibility for appointment of counsel because one spouse cannot liquidate certain community property assets without the consent of the other spouse. Finally, Defendants argue that individual retirement accounts cannot be considered by the Court since they are not subject to attachment, levy and execution and are exempt from liquidation in bankruptcy proceedings. Moreover, Defendants argue that they are now unemployed and unemployable due to the charges pending against

them, and that their spouses are already carrying the full financial burden to support them and their families. Therefore, Defendants conclude, whether willing or unwilling, their spouses are unable to support them and their families, and also pay for Defendants' defense, which would be extraordinarily costly.

The government argues that the Court must consider all assets and financial resources of Defendants' families in determining eligibility for appointed counsel, including individual retirement accounts over which the Defendants exercise ultimate control. The government further argues that since Defendants and their spouses each have the right to the control of all community property assets, all assets should be considered by the Court.

Assuming the Court accepts each argument of the government and considers all assets of the Defendants, whether separate property of a spouse, all community assets, separate retirement accounts or any other assets included in the financial affidavits submitted, the Court concludes that these two Defendants are eligible for appointed counsel. As a result, the issue of Defendants' eligibility for appointed counsel is less about whether defendants qualify for appointment of counsel and more about which assets may be considered by the Court assessing whether Defendants can provide partial contribution as an offset toward the attorney fees and related expenses likely to be incurred as part of the defense to the charges pending against them. Thus, despite the conclusion that each Defendant is eligible for appointed counsel, the Court proceeds with an examination each of issue since the outcome of that analysis dictates what, if any, contribution Defendants can make toward attor-

---

1. The eligibility of each Defendant for appointed counsel is treated separately except for the common legal issues.

2. Copley Press took no position regarding this portion of the briefing or argument.

ney fees and expenses under 18 U.S.C. § 3006A(f).

The Criminal Justice Act ("CJA") requires each district court to establish " . . . a plan for furnishing representation for any person financially unable to obtain adequate representation . . ." 18 U.S.C. § 3006A (a)[3]. The Guide To Judiciary Policies and Procedures, approved by the Judicial Council of the United States (hereinafter "Guide"), provides direction and elaboration to the court with respect to application of the statute.

Volume VII, Chapter II, § 2.04 of the Guide indicates that an individual is " ' . . . financially unable to obtain counsel' . . . if . . . financial resources and income are insufficient to enable him to obtain qualified counsel." The Guide also states that "Any doubts as to a person's eligibility should be resolved in his favor."

Volume VII, Chapter II, § 2.06 states:

*Family Resources* The initial determination of eligibility should be made *without regard to the financial ability of the person's family, unless his family indicates a willingness and financial ability to retain counsel promptly.* At or following the appointment of counsel, the judicial officer may inquire into the financial situation of the person's spouse... and if such spouse... *indicates their willingness to pay* all or part of the costs of counsel, the judicial officer may direct deposit or reimbursement.

(Emphasis added)

Thus, the Guide makes clear that the Court is to consider Defendants' own individual assets in determining eligibility for appointed counsel. It follows that if the Defendant's own property is what the Court is to consider, the separate property of the spouse is not among the assets the court can include in its evaluation in this case. In effect, the Guide appears to eliminate consideration of the separate property of the spouse.

The Guide is also clear that if the Defendants' spouses are unwilling or financially unable to retain counsel, the spouses' assets are not to be considered by the Court. In this case, Defendants' counsel have orally represented to the Court that Defendants' spouses are unwilling and/or financially unable to retain counsel for Defendants.

The unwillingness or inability of the spouses to retain and pay for counsel requires analysis of the community property assets of the Defendants and their spouses, since the degree of control over those assets, and the ability to dispose of them by Defendants, determines whether the Court can include them in the evaluation of the Defendants' eligibility.

Defendants argue that the Guide, and case law, indicate that the Court should not look to their community property assets to determine eligibility for court-appointed counsel. Specifically, Defendants point to the Guide at § 2.06, which, as previously indicated herein, directs that the initial determination of eligibility should be made without regard to the financial ability of the person's family, unless his family indicates willingness and financial ability to retain counsel promptly. Further, Defendants contend that case law is in accord with their position. Defendants cite *U.S. v. Zelenka* 112 F.Supp.2d 708, 715–716 (M.D.Tenn.1999), in which the court noted that in assessing a defendant's eligibility for appointed counsel, courts

**3.** The District Judges of the Southern District of California have adopted a Local CJA Plan which has been approved by the Ninth Circuit Judicial Council. The language of the Local CJA Plan substantially tracks the language of the Guide. See Vol VII, Chapter II, etc., of the Guide and the Local CJA Plan, § IV(D)(1).

should look to assets that the defendant owns and controls. Defendants also cite *U.S. v. Salemme* 985 F.Supp. 197, 201, 203 (D.Ma.1997) for the same proposition.

The government argues that the Court should consider Defendants' spouses' assets in determining Defendants' eligibility for appointed counsel. First, the government argues that since the CJA 23 financial affidavit form requests information regarding the spouse's assets, the information should be used in the eligibility determination. Second, the government contends that case law allows the Court to consider a defendant's other sources of income, such as a spouse's income, in determining eligibility for appointed counsel. Third, the government contends that Defendants should use their community property assets to retain counsel. Fourth, the government urges that Defendants seek the benefit of listing joint expenses in their submitted financial information, therefore their spouses should pay for their legal defense.

■ The Court finds the government's arguments unpersuasive. First, simply because the CJA 23 financial affidavit form requests a defendant's spouse's financial information, does not necessarily mean that the Court can consider that financial information in this case. In fact, § 2.06 of the Guide expressly counsels against that consideration. However, if a spouse indicates a willingness and financial ability to retain counsel, or to contribute to the costs of defense, the spouse's financial information provided on the Form 23 could then be considered by the Court.

Second, the cases cited by the government that the Court should consider Defendants' income from other assets, including Defendant's spouses', are inapposite. The government cites *U.S. v. Deutsch* 599 F.2d 46 (5th Cir.1979) to support its position. However, in *Deutsch*, the Fifth Circuit approved of the district court's refusal to appoint counsel because shortly before the defendant requested appointed counsel, the defendant estimated his wife's earnings at close to $1 million, and "subsequently engaged in a practice of transferring assets to his wife in order to avoid liability." *Id.* at 49. The government also cites *U.S. v. Rosch* 1994 WL 364090 at *1 (N.D.Il.1994) for the same proposition. In *Rosch*, the defendants placed substantial assets of their own in the names of family members to avoid creditors and obtain appointed counsel. In this case, there is no contention or evidence that Defendants have engaged in transferring their assets to family members or are otherwise inappropriately disposing of them.

The government also cites *U.S. v. Simmers*, 911 F.Supp. 483, 484, 486–487 (D.Kan.1995). However, in *Simmers*, the court, while acknowledging the defendant's wife's monthly income of $600, denied appointment of counsel based on the defendant's sole ownership of his home. Here, Defendants do not have sole ownership of their homes.

The government also relies on *U.S. v. Caudle* 758 F.2d 994, 996 (4th Cir., 1985) in which the court noted the defendant's spouse's income in determining that the defendant was financially unable to obtain counsel. However, the *Caudle* court does not address the Guide's directions, whether the defendant's wife was willing to contribute to the defendant's defense and whether the court actually considered the wife's assets in concluding that the defendant was financially unable to retain counsel.

Third, the Court cannot consider all Defendants' community property assets in this case, which are co-owned by their spouses. The government contends otherwise and supports its position by citing to *Lezine v. Security Pacific Fin. Serv.* 14 Cal.4th 56, 58 Cal.Rptr.2d 76, 925 P.2d

1002 (1996) and portions of the California Family Code to suggest that a married couple's entire community property is liable for a debt incurred by just one spouse, regardless of the other spouse's consent to incurring the debt. In *Lezine*, the husband forged his wife's signature on a quitclaim deed for the couple's home, transferring the home solely to himself, then incurred a huge debt using the home as security, without his wife's knowledge. The court held that the bank could seek satisfaction for the debt secured by the home against the couple's community property. Therefore, the government implies that Defendants should sell (or encumber) their homes to obtain money to pay for their legal expenses. However, *Lezine* does not address the eligibility for appointment of counsel in federal criminal cases, and the holding does not otherwise apply because in *Lezine* the bank was an "innocent" party, a factual situation that does not exist here. Moreover, there is absolutely no suggestion that Defendants in this case would or should do what the husband in *Lezine* did.

Fourth, Defendants do not seek any benefit in listing their joint expenses in their submitted financial information. The government contends that by submitting joint expenses to the Court, Defendants and their spouses act as single individual economic units, thus allowing the Court to consider their spouses' community property assets in determining eligibility for court-appointed counsel. As noted previously, at present Defendants and their spouses are not truly functioning as single economic units because Defendants are unemployed. They are not financially contributing to any economic unit. Therefore, for the present, the Court declines to adopt the government's perspective that Defendants' listing of their joint expenses benefits them.

■ The above authority cited and argued by the parties relative to inclusion of community property in the Court's evaluation of eligibility for appointed counsel is at best, inconclusive. The most that can be said is that if the asset is of the type, such as jointly held real property, where both spouses are obligated to consent to the encumbrance, disposition or transfer, and objection is timely interposed by one spouse, then that asset is likely not available to the defendant spouse for encumbrance or liquidation to satisfy attorney fees and costs. However, none of the cases cited address how to deal with an asset over which an individual spouse does, in fact, have such supervision and control such that encumbrance, transfer or other disposition of the asset is possible without requiring the advance consent of the other spouse. Without further clarifying authority, the Court concludes that to the extent any asset is jointly held and individually disposable by either spouse without advance consent, then that spouse has sufficient supervision or control over that asset so that it is appropriately considered during the evaluation process. In this case, the court finds that any salary, joint savings or checking accounts of the Defendants fall within the category of community property assets which the Court can consider in making its evaluation. Whether any other such assets exist is a factual issue subject to case-by-case analysis.

The Court notes that several of the government's arguments imply that a Defendant's use of the CJA Form 23 is mandatory. The logical extension of that argument is that it is appropriate for the Court to consider all responses provided on the form in evaluating a Defendant's Applications for Appointment of Counsel. However, the use of CJA Form 23 is not mandatory. 18 U.S.C. § 3006A does not direct its use, but merely states, " ...the United States magistrate judge or the court, if satisfied after appropriate inquiry... shall

appoint counsel..." 18 U.S.C. § 3006A(b) Likewise, there is nothing in the Guide that requires its use.[4] The Local CJA Plan provides simply that an affidavit, or testimony under oath, may be used in the discretion of the judge considering the application. Local CJA Plan, § IV(D)(1) As a result, there is no requirement that Form 23, or, for that matter, any particular form, be utilized.

The final issue before the court relative to assets which can be considered in evaluating the Defendants' eligibility is Defendants' individual retirement accounts. Defendants argue that their individual retirement accounts cannot be considered by the Court in the eligibility determination. Defendants indicate that since, pursuant to 26 U.S.C. § 408(e)(1), the money in the retirement account cannot be taxed until it is withdrawn during retirement, it must be considered future income. § 2.04 of the Guide states that "future earnings should not be considered or subject to a reimbursement order..."

Further, federal law exempts, with certain exceptions not applicable here, retirement accounts from alienation or attachment. See 29 U.S.C. § 1056(d) The Court notes that 29 U.S.C. § 1056(d) allows a participant in a retirement plan to borrow funds from his or her retirement account if the loan is secured by the participant's accrued non-forfeitable benefit and is exempt from the tax imposed by 26 U.S.C. § 4975. Similarly, the funds contained in retirement accounts are exempt from a bankruptcy estate for distribution to creditors. *Rousey v. Jacoway* 544 U.S. 320, 125 S.Ct. 1561, 161 L.Ed.2d 563 (2005). Courts have acknowledged "that strong public policy favors protection of retire-

ment plans..." *Seltzer v. Cochrane,* 104 F.3d 234, 236 (9th Cir.1996)

The government argues that the Court should consider Defendants' retirement accounts because the CJA 23 financial affidavit form requests that defendants list "stocks, bonds, or notes, not what type of investment vehicle the property is held in." However, the government does not explain how the CJA 23 financial affidavit form's request for "stocks, bonds, or notes, not what type of investment vehicle the property is held in," implicates a defendant's retirement account. If the CJA form envisioned a Defendant providing what type of investments and assets were in a defendant's retirement account, the Court presumes the form would so state.

The government also cites *Rosch, supra,* for the proposition that the Court should consider a Defendant's retirement account in determining eligibility for court-appointed counsel. However, in *Rosch,* the court denied the defendant's request for counsel because it found that the defendant had significant other assets, which he placed in the names of family members. The *Rosch* court did not consider the defendant's retirement account in its determination.

The government also relies on *In re Magnano* 1992 WL 116041 (E.D.La.1992) in which a civil plaintiff sought appointment of counsel in a Title VII employment discrimination case. While the court considered requesting the plaintiff's IRA account balance, the court also noted that the plaintiff had a $12,000 bank account balance and that the EEOC had issued a decision adverse to plaintiff, in denying the request for appointment of counsel. This civil case is not instructive nor applicable to the issues before the Court.

---

4. The Guide, at Vol VII, Appendix A states in part about CJA Form 23: "NOTE: this form may be used in determining eligibility for the appointment of counsel or authorization of other services. Whether or not this affidavit shall be required, as opposed to using alternative means of determining the financial status of the 'person represented,' such as through oral swearing, will be at the court's discretion."

The government also relies on *U.S. v. O'Neil* 118 F.3d 65, 74 (2nd Cir.1997), in which the court considered the defendant's $15,000 business investment. The *O'Neil* court denied the defendant's request for appointment of counsel because of the expected earnings from the investment, the defendant's financial ability to travel just days before the request, and the defendant's statements that he could afford counsel, but not the counsel of his choice. *O'Neil* does not discuss the applicability of a defendant's retirement account to a determination of eligibility for court-appointed counsel.

■ Based on the foregoing, the Court concludes that retirement accounts may not be included in determination of eligibility in this case. As noted by Defendants, retirement accounts are protected from attachment, levy and execution and disposition in bankruptcy proceedings, and the court excludes them from consideration. However, the Court does not decide at this time whether Defendants may be capable of borrowing funds from their retirement accounts to pay for, or contribute to, their legal expenses in this case.

■ Finally, as indicated earlier, the Court determines that whether all assets of the Defendants or their family are used for determination of eligibility for appointment of counsel, the result is the same. Defendants are unemployed and have represented to the Court that efforts to secure gainful employment have been unsuccessful. The entire burden of providing for their families has thus fallen to their spouses. It is conceded by all concerned that the issues in this case are complex, the costs of each Defendant's defense in this case will be enormous, discovery will be monumental in volume and scope and there will be multiple motions which Defendants will either bring or have to defend. The events in this case date back to the mid–1990's and involve volumes of records, dozens of individuals and witnesses. Additionally, Defendants are faced with other criminal, civil and administrative actions more particularly described above. Thus, it is inconceivable that these Defendants would have the financial ability to pay for retained counsel under these circumstances. The Court determines that each Defendant is eligible for appointed counsel and confirms herein the appointments which were established on provisional basis at the first appearance of the Defendants. Therefore, Defendants' Applications for Appointment of Counsel are GRANTED, subject to the following:

On or before *June 1, 2006*, Defendants shall each file with the Court affidavits of their spouses stating that the spouses are unwilling and/or financially unable to retain counsel on Defendants' behalf or contribute to the same for their expenses;

On or before *July 3, 2006*, and on a quarterly basis thereafter, Defendants shall each submit to the Court updates of their individual financial conditions, in the form of affidavits signed under penalty of perjury, including the status of any indemnity rights.

On or before *July 3, 2006*, and on a quarterly basis thereafter, Defendants shall each submit to the Court affidavits signed under penalty of perjury regarding their ability or inability to borrow funds from their retirement accounts for purposes of paying for, or contributing to, their legal expenses in this case.

As to each Defendant, the Court retains jurisdiction to modify this Order based upon the affidavits submitted by Defendants and other information that may be submitted to the Court which is relevant to the issue of the Defendants' ability to pay for or contribute to their attorney fees and expenses. Therefore, this Order is without prejudice to a modification which may include a requirement that either or both

Defendant provide partial or full reimbursement for attorneys fees and costs from the date of appointment of counsel. See 18 U.S.C. § 3006A(f); Guide § 2.04. Counsel are advised to maintain records of time expended and costs incurred in representing their respective clients. The Court also reminds each Defendant that filing false statements with the Court may result in prosecution for perjury and/or making false statements.

*Copley Press' Motion for Emergency Intervention and Access to Review and Copy Court Records*

Copley moves to intervene in this case in order to gain access to all court records in this case, including Defendants' financial information submitted to the Court in connection with their Requests for Appointment of Counsel. Copley supports its Motion by asserting that Fed. R. Civ. Pro. 24(b) allows such intervention. Defendants oppose the Motion by arguing that Fed. R. Civ. Pro. 24 does not apply in criminal cases and that Copley should be denied participation rights.

 At the outset, the Court finds that insofar as Copley's Motion seeks "all court records" in this case, the request is over broad and is DENIED without prejudice. Copley also objects to the Sur–Reply of Defendants in which Defendants claim that disclosure of their personal financial information may subject them to identity theft. Defendants appear to have abandoned this argument. Therefore, Copley's objection is moot. To the extent Defendants maintain this argument, the Court rejects it as speculative.

 As to Copley's asserted basis for intervention, Defendants correctly point out that Fed. R. Civ. Pro. 24 has no applicability in criminal cases. *New York Times v. Adamita*, 708 F.Supp. 603 (S.D.N.Y.1989) Copley has not presented any authority, nor has the Court independently found any authority that Fed. R. Civ. Pro. 24 provides any basis or is the proper vehicle by which Copley, or any media representative, may inject itself in a criminal proceeding. To permit Copley to intervene in this, or any criminal proceeding, would be inconsistent with the constitutional and statutory rights and privileges of Defendants and the government. As a result, Copley's Motion to Intervene pursuant to Fed. R. Civ. Pro. 24 is DENIED.

 Nevertheless, cases have recognized that the press has a limited, qualified right to seek access to certain pretrial criminal proceedings and judicial documents. *Globe Newspaper Co. v. Superior Court* 457 U.S. 596, 609 n. 25, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), *Press–Enterprise v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). The First Amendment recognizes a "general right to inspect and copy public records and documents". *Phoenix Newspapers v. U.S. District Court* 156 F.3d 940, 946 (9th Cir.1998) [quoting *Nixon v. Warner Communications*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) ] In addition to a constitutional right of access, "there is a strong presumption in favor of the common law right to inspect and copy judicial records." *Phoenix Newspapers* 156 F.3d at 946 However, there is no right of access which attaches to all judicial proceedings, even all criminal proceedings. *Id., Times Mirror Co. v. U.S.*, 873 F.2d 1210, 1217 (9th Cir.1989). Therefore, subject to the extent the law allows Copley to seek access to court records on behalf of the public, Copley's Motion is GRANTED.[5]

---

5. The government concedes that it lacks standing to assert the public's rights of access to financial affidavits submitted in support of Defendants' Requests for Appointment of Counsel. Accordingly, the government takes no position on whether the Court should prevent the public from accessing Defendants'

*Defendants' Motion to Seal Personal Financial Information Submitted in Support of Requests for Appointment of Counsel & Copley's Motion for Access to Records*

■ The final issue before the Court is one not directly addressed by any published opinion in the Ninth Circuit: Whether the CJA Form 23 and financial information submitted by a defendant in a criminal case in support of an application for appointment of counsel under 18 U.S.C. § 3006A are judicial records subject to public access. The government and Copley seek, and Defendants resist any efforts to gain access to, those documents. The Court, pending resolution of this issue, provisionally sealed the CJA Form 23 and the supporting financial information submitted by Defendants in support of their Applications for Appointment of Counsel.

The key to this issue is the definition of "judicial records." Defendants argue that the financial documents are not judicial in character and that there is no statutory or regulatory scheme which requires an applicant for appointment of counsel to submit particular forms to the court. Further, Defendants argue that there is no public right of access to CJA Form 23 and financial information submitted for purposes of applying for appointment of counsel. The financial information contained in documents submitted to the Court are administrative in nature rather than judicial pleadings or court records, and are used solely for the Court's analysis. Defendants also argue that there is no statutory requirement that they submit documentary financial information to support their requests for appointment of counsel, and that the information at issue not only affects their rights to financial privacy, but the financial privacy rights of their spouses. Lastly, Defendants argue that it is

fundamentally unfair for the Court to condition their Sixth Amendment right to counsel on the waiver of their constitutional rights to privacy.

Copley argues that there is a strong presumption of public access to inspect and copy judicial records; the documents sought are judicial records, and that the analysis of press access to these documents under established case law indicates that Copley must be granted the access it seeks.

The government argues that regardless of Copley's assertions, it has an independent right of access to Defendants' financial information. The government's argument is based on its interest in ensuring that public funds are not misused. The government cites *Zelenka* 112 F.Supp 2d at 712, in which the court stated: "(t)he government always has the right and indeed it is charged with the responsibility of bringing to the court's attention any possible misuse or waste of public funds."

The government also argues that case law requires that a court may not order a defendant's financial information sealed unless it makes a specific determination that disclosure would present a substantial hazard of self-incrimination, citing *U.S v. Kodzis* 255 F.Supp 2d 1140, 1144 (S.D.Cal. 2003) and *Seattle Times v. U.S. District Court* 845 F.2d 1513, 1518 (9th Cir.1988)

1. *The CJA Form 23 and related financial documents submitted in support of requests for appointment of counsel are not judicial documents subject to a right of access.*

There is only one published opinion which directly addresses the issue before the Court. *Boston Herald, Inc. v. Connolly* 321 F.3d 174 (1st Cir.2003). The facts in *Boston Herald* are slightly different

---

financial information. (Government's Memorandum of Law Re Sealing Defendant Lexin's

and Webster's Financial affidavits and Information, filed Feb. 10, 2006, at 1–2)

from those in this case but involve the same documents, statute and administrative guidelines. In *Boston Herald,* the press sought access to sealed CJA Form 23 and related financial documents which the defendant had submitted in seeking appointment of counsel. However, there the documents were sought *after* the defendant had been convicted, not as here, at the time of arraignment on the indictment. The First Circuit concluded that the documents containing the defendant's financial information submitted to the Court in support of his Request for Appointment of Counsel are not judicial documents subject to disclosure and press access. *Boston Herald, Inc. v. Connolly* 321 F.3d 174 (1st Cir.2003). *U.S. v. Gonzales,* 150 F.3d 1246 (10th Cir.1998)

The *Boston Herald* court went through an exhaustive analysis of the very arguments raised in this case, particularly the issue of whether CJA eligibility submissions are "judicial documents." The court cited *Gonzales* in support of its decision.

The court also noted that the process for handling documents regarding eligibility for court-appointed counsel is not a blanket rule denying access. Rather it strikes a balance in which disclosure is presumed, but one which may be displaced by making case-specific findings.

In *Gonzales,* the court held that the process used by the federal courts to appoint counsel in criminal cases is administrative in nature. The *Gonzales* court noted that the guidelines for appointment of counsel are all generated by the Administrative Office of the United States Courts under authority granted by the Judicial Conference of the United States. Therefore, the guidelines are purely administrative, and the court acts essentially in an administrative, not a judicial, capacity when it approves requests for appointment of counsel and related motions for trial assistance. *Id.* at 1254–1255.

The *Gonzales* court also noted that the administrative nature of the process of appointment of counsel is apparent in that the process is non-adversarial; the court acts *ex parte,* and there is no appeal of the appointing (or non-appointing) court's decision. *Id.* at 1255.

Further, the *Gonzales* court noted that vouchers submitted by court-appointed attorneys for payment of legal fees are documents that are not used at trial. The documents do not show guilt or innocence of the defendant and are not evidence of a crime. Instead, they are entirely ancillary to the trial. *Id.* at 1255.

This Court agrees with the *Boston Herald* and *Gonzales* courts. The guidelines that this Court uses to appoint counsel in criminal cases arise from the Judicial Guide to Policies and Procedures, an *administrative* guide generated by the Administrative Office of the United States Courts under authority granted by the Judicial Conference of the United States. This *administrative* guide establishes, *inter alia,* the processes which may be used by the federal courts to appoint counsel in criminal cases.

The documents containing the financial information of a Defendant requesting appointment of counsel that are submitted to the court are not related to the process of adjudicating whether defendants are guilty or innocent of the crimes of which they are charged. Nor is the information contained in the documents evidence that the charged crime was committed. Counsel for the government does not routinely claim that defendants are not entitled to court-appointed counsel, and typically takes no position one way or the other— and has not done so in this case.

The Court recognizes that Copley and the government rely on *Seattle Times v. U.S. District Court* 845 F.2d 1513 to come to a contrary conclusion. However, in *Se-*

*attle Times,* the court *assumed without deciding* that affidavits submitted in support of applications for court-appointed counsel are pretrial documents subject to the public's right of access. *Id.* at 1516, n. 1 The court then analyzed whether memoranda submitted by the government and the defendant with regard to detaining the defendant pending trial should be subject to the public right of access. The court further noted that it had "not previously decided whether a defendant acts under state compulsion when he discloses financial information in order to obtain appointed counsel." *Id.* at 1519, n. 4. The court ultimately decided that while financial affidavits submitted in support of a request for appointed counsel may raise Fifth Amendment concerns, none were raised in the case at that time and that any Fifth Amendment problem was speculative and prospective. *Id.* at 1519. In *Seattle Times,* the court did not address the specific issue raised here, and these Defendants do not raise any Fifth Amendment concerns. Therefore, the Court concludes that *Seattle Times* is inapposite.

The Court also notes that Copley and the government rely on *U.S. v. Kodzis* 255 F.Supp.2d 1140 In *Kodzis,* the court held that it could not order the defendant's financial information to be filed under seal unless it made a specific determination that disclosure of the defendant's financial information would present a substantial hazard of self-incrimination that is real and appreciable. Obviously, in *Kodzis,* the court dealt with the defendant's claim that disclosure of his financial information presented to secure court-appointed counsel would violate his Fifth Amendment right against self-incrimination. Defendants in this case do not claim that their Fifth Amendment rights would be affected by disclosure of their financial information. In addition, the issue of whether the CJA Form 23 and any related financial documents were or were not judicial records was not before the court. Therefore, *Kodzis* is not helpful in this Court's analysis.

Therefore, the Court concludes that the documents containing Defendants' personal financial information submitted to support their Requests for Appointment of Counsel, are not judicial documents. Rather, they are administrative documents not subject to disclosure to the public or press.

## 2. First Amendment

Assuming for purposes of this opinion that the documents containing Defendants' personal financial information are judicial documents subject to disclosure, and even if the Court accepts Copley's argument that a First Amendment analysis should apply to these documents, the Court reaches the same conclusion that the documents in question are not subject to disclosure.

The First Amendment recognizes "a general right to inspect and copy public records and documents, including judicial documents and records." *Phoenix Newspapers,* 156 F.3d at 946 In addition to a constitutional right of access, "there is a strong presumption in favor of the common law right to inspect and copy judicial records." *Phoenix Newspapers,* 156 F.3d at 946. However, "there is no right of access which attaches to all judicial proceedings, even all criminal proceedings." *Id.; Times Mirror Co.* 873 F.2d at 1217 *Press–Enterprise II*

Any discussion of the qualified First Amendment right of public access to criminal proceedings and records must begin with the leading case of *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II* ). *Press–Enterprise II* sets forth the analytical framework to be followed in a case such as this. Under the two-step framework adopted by the Supreme Court, the court determines in the first instance

whether a qualified First Amendment right of access attaches to the proceeding or documents at issue and, if so, then the court determines whether closure serves a compelling interest. The first step "emphasize[s] two complementary considerations" which should be separately analyzed on the threshold question of whether the First Amendment right of access even attaches to the proceeding or document. *Id.* at 8, 106 S.Ct. 2735. The court first considers "whether the place and process have historically been open to the press and general public." *Id.* Then, the court considers "whether public access plays a significant positive role in the functioning of the particular process in question." *Id; Oregonian Publishing Co. v. United States Dist. Court,* 920 F.2d 1462, 1465 (9th Cir. 1990). If these two "considerations of experience and logic" favor disclosure, a qualified First Amendment right of access attaches to the documents in question.

■■■ Once the court determines that a First Amendment right of access attaches to the particular proceeding or documents at issue, the proceedings or documents cannot be closed to the public absent a specific finding "that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press–Enterprise I* ). The court must articulate that interest and make "findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* The Supreme Court "has made clear that criminal proceedings and documents may be closed to the public without violating the First Amendment only if three substantive requirements are satisfied: (1) closure serves a compelling interest; (2)

there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *Oregonian Publishing,* 920 F.2d at 1466; *Press–Enterprise II,* 478 U.S. at 13–14, 106 S.Ct. 2735. *Press–Enterprise II* requires the court to "balance the public's right of access against the privacy and fair trial interests of defendants, witnesses and third parties." *United States v. Gerena,* 869 F.2d 82, 85 (2d Cir.1989). The court must also consider the "privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure of the material and should weigh heavily in a court's balancing equation in determining what portions of motion papers in question should remain sealed or should be redacted." *Id.* In light of the standards developed to analyze qualified First Amendment right of access issues, the court turns to the experience and logic considerations.[6]

*The Experience Consideration*

In determining right of access issues, the historic context of the particular criminal proceeding at issue is significant not only "because the Constitution carries the gloss of history," but also because "a tradition of accessibility implies the favorable judgment of experiences." *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 605, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). Certain aspects of criminal proceedings, such as access to criminal trials, have traditionally been open to the public throughout this country's history and even before in England, *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 569, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) ("at the time when

---

**6.** The following analysis applies equally to the common law right of access. See *Times Mirror,* 873 F.2d at 1210 (no common law right of access where there exists neither a history of public access nor important public need).

our organic laws were adopted, criminal trials both here and in England had long been presumptively open" to the public), but other aspects of criminal proceedings have not been open to the public. *See Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979) ("the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings"). Courts have found an historic tradition of access to various aspects of criminal proceedings including jury voir dire, *Press–Enterprise I,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629; *Brooklier,* 685 F.2d 1162 (9th Cir.1982), preliminary hearings, *Press–Enterprise II,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1, suppression hearings, *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), and bail hearings. *In re Globe Newspaper Co.,* 729 F.2d 47 (1st Cir.1984).

Applying the experience factor, the court finds no historical tradition of open public access to documents submitted by a defendant in support of a request for appointment of counsel.

Courts have concluded that since the Criminal Justice Act, (under which Defendants have submitted their personal financial information), is relatively new, having been enacted in 1964, there has not been enough time to evaluate whether the type of documents sought here should be subject to disclosure. *Boston Herald* 321 F.3d at 184, *Gonzales* 150 F.3d at 1256–1257. However, these courts have also held that the mere connection of a document to a criminal case does not itself link the document to the tradition and experience of public access. Documents pertaining to a defendant's eligibility for a court-appointed attorney are peripheral to the Defendant's trial, when compared to the processes where the tradition of access has triggered the First Amendment right. *Boston Herald* 321 F.3d at 183 [See for

example *Richmond,* 448 U.S. at 569, 100 S.Ct. 2814 (criminal trials), *Press–Enterprise I, Brooklier,* 685 F.2d 1162 (jury *voir dire* ), *Brooklier* (motions to suppress evidence), *Globe Newspaper* 729 F.2d 47 (bail hearings) ] To conclude otherwise would create a right of access to anything remotely associated with a criminal trial and would not comport with precedent allowing access in only certain contexts. *Boston Herald* 321 F.3d at 185.

Moreover, the process of appointing counsel for a financially eligible defendant is a non-adversarial process, where the outcome of the defendant's trial is irrelevant. "It is the judge who protects the interests of the public fisc in a process that has traditionally closed to the prosecution." *Gonzales,* 150 F.3d at 1255, 1257.

Further, any argument that posits that there has been a tradition of public access to the documents at issue here, because the court's granting a request for appointment of counsel will lead to an expenditure of public funds, fails upon scrutiny. Prosecutors and public defenders do not traditionally disclose or publish detailed financial information explaining their use of public funds and resources to prosecute or defend specific criminal cases. *Boston Herald* 321 F.3d at 185, *Gonzales* 150 F.3d at 1260. Consequently, the court does not see how a tradition of public access would attach to a defendant's use of public funds or resources in defending against criminal charges.

Moreover, in government benefit programs administered by the Executive branch, there is a strong tradition of non-disclosure of personal financial information. See 42 U.S.C. § 302(a)(7) (safeguards to prevent public disclosure of information regarding Social Security recipients) *Id.* at 185.

Finally, as previously noted, when the court appoints an attorney for a defendant,

it is influenced and directed by the Guide. The Guide provides for *ex parte, in camera* hearings that are not traditionally open to public access. For example, the Guide states:

> *Ex parte* applications for services other than counsel under subsection (e) shall be heard *in camera*, and shall not be revealed without the consent of the defendant. The application shall be placed under seal until the final disposition of the case in the trial court, subject to further order of the court. Maintaining the secrecy of the application prevents the possibility that an open hearing may cause a defendant to reveal his or her defense . . .

Guide, Vol. VII, Ch. 3, § 3.03

Further, the Guide also provides, in the context of release of information in the appointment of counsel context,

> . . . Generally, such information which is not otherwise routinely available *unless it is judicially placed under seal, or could reasonably be expected to unduly intrude upon the privacy of the attorneys or the defendants*, compromise defense strategies, investigative procedures, attorney work product, the attorney-client relationship or privileged information provided by the defendant or other sources; or otherwise adversely affect the defendant's right to the effective assistance of counsel, a fair trial, or an impartial adjudication. Upon request, or *upon the court's own motion*, documents pertaining to activities under the CJA and related statutes maintained in the clerk's open files, which are generally available to the public, *may be judicially placed under seal or otherwise safeguarded until after all judicial proceedings, including appeals, in the case are completed, and for such time thereafter as the court deems appropriate* . . .

Guide, Vol. VII, Ch. 5, § 5.01 (citation omitted)(emphasis added)

The citations to the Guide reinforce the notion that the process of appointment of counsel in criminal cases is a non-adversarial process in which the judge is tasked with determining whether a defendant is appointed an attorney and whether other services will be provided to a defendant at the public's expense. A defendant's personal financial information submitted in support of a request for appointment of an attorney is not subject to scrutiny by anyone other than the judge, who may seal such information for the various reasons noted above.

In light of the foregoing, the Court concludes that no history, experience or tradition of access exists as to the disclosure of any personal financial information submitted in support of a request for appointment of counsel.

*The Logic Consideration*

The logic consideration seeks to determine "whether public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise II*, 478 U.S. at 8, 106 S.Ct. 2735. The "considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes." *Id.* at 9, 106 S.Ct. 2735. Here, allowing public access to a defendant's personal financial information does not play a significant positive role with respect to the process of determining whether a defendant is eligible for appointed counsel. Instead, public access to this information could, in fact, play a negative role.

The determination of whether a defendant is eligible for appointed counsel does not implicate judicial power or the merits of the criminal case. Access to a defendant's personal financial information does not present the public with any concern regarding the crime to which the defen-

dant is charged. Nor does the determination of eligibility impose consequences upon members of society at large. *Boston Herald* 321 F.3d at 187, citing *Richmond*, 448 U.S. at 571, 100 S.Ct. 2814. Nor does access to a defendant's personal financial information serve the need of the public to have a full understanding necessary to serve as an effective check on the judicial system. Practically, public access to a defendant's personal financial information does not improve a judge's determination of eligibility for appointed counsel because access would not facilitate greater accuracy in that determination. *Boston Herald* 321 F.3d at 187.

The standards for granting a defendant's request for appointed counsel are flexible and give the benefit of the doubt to a defendant who requests appointed counsel. The financial information submitted by a defendant is not publicly accessible at the time it is presented to the judge making the eligibility determination. The public is not in a position to challenge the accuracy of the financial information submitted by a defendant. Significantly, if a judge has doubts about the accuracy of the submitted financial information, he or she can request further documentation from the defendant, and from the prosecutor. See Guide, Vol. VII, Ch. II, § 2.03(C). If the submitted financial information is inaccurate, the court may rescind the appointment of counsel and order a defendant to repay any public funds spent in his or her defense. *Id.* at 187. In fact, in this case, the Court has ordered that Defendants are to submit quarterly updates of their financial conditions in the form of affidavits signed under penalty of perjury. As a result, if the quarterly reports show that Defendants' financial condition has changed such that they are no longer financially eligible for court-appointed counsel, the Court can order Defendants to repay the complete, or partial, amounts spent for their defense.

Moreover, a defendant's financial condition is investigated in the process of preparing a presentence report.[7] Therefore, the court is aware that, in the event that a defendant is convicted of the charged crime, there will be an independent examination of a defendant's financial condition. *Id.* at 187.

Therefore, the Court concludes that under the logic consideration standard set forth in *Press–Enterprise II*, the positive role in the functioning of the appointment of counsel process is, at best, minimal.

Disclosure of a defendant's personal financial information could actually play a negative, rather than positive, role in the process of determining eligibility for appointed counsel.

The process by which a defendant obtains court-appointed counsel is a vehicle to effectuate a defendant's Sixth Amendment right to counsel. A right of access to a defendant's personal financial information puts the defendant in the precarious position of exercising his Sixth Amendment right to counsel over his constitutional right to informational privacy.[8] *Id.* at 188.

---

7. The Court notes that most courts consider presentence reports as confidential reports to the court and are not considered public records, except to the extent that they, or portions of them, are placed on the court record or authorized for disclosure to serve the ends of justice. *U.S. v. Schlette,* 842 F.2d 1574, 1579 (9th Cir.1988), *citing U.S. v. McKnight,* 771 F.2d 388, 390 (8th Cir.1985) *cert. denied* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986), *U.S. v. Anderson,* 724 F.2d 596, 598–99 (7th Cir.1984).

8. Relevant U.S. Supreme Court precedents and the Ninth Circuit have recognized the constitutionally protected interest in avoiding disclosure of personal information, which is generally referred to as the right to "informational privacy." *Crawford v. U.S. Trustee,* 194 F.3d 954, 958 (9th Cir.1999), citing *Whalen v. Roe* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51

Since a defendant who requests appointment of counsel would necessarily be forced to choose between his constitutional right to counsel and his constitutional right to informational privacy, public access to a defendant's personal financial information could discourage eligible defendants from availing themselves of their constitutional right to counsel. Public disclosure might lead an otherwise eligible defendant to withhold financial information because disclosure of such information may put him or her at risk of harm to his or her property and/or family if the information is misused by his or her enemies. *Id.* at 188 Therefore, this Court declines to force a defendant to choose between one constitutional right over another. "The law does not force criminal defendants to make such a Hobson's choice." *Id.* at 188, n. 8

Further, in this case, access to the Defendants' personal financial information implicates the informational privacy rights of the Defendants' spouses. The Court's review of the financial information submitted by Defendants in support of their Requests for Appointment of Counsel indicates that Defendants own assets jointly with their spouses. Therefore, to allow public access to Defendant's financial information would necessarily expose the personal financial information of Defendants' spouses. Under these circumstances, the Court sees no justifiable basis on which to force the disclosure of the personal financial information of Defendants' spouses, as they are innocent third parties, not involved in this criminal case. *Id.* at 191, *U.S. v. Amodeo* 71 F.3d 1044, 1051 (2nd Cir.1995)

The Court recognizes that Copley relies on *U.S. v. Suarez* 880 F.2d 626 (2nd Cir. 1989). In *Suarez*, the press moved for access to documents submitted by court-appointed attorneys, and documents *approving payments* for the court-appointed attorneys and their experts. The court concluded that the public has a qualified First Amendment right of access to the documents *after payment was approved. Id.* at 631. Here, this Court is not faced with the same issue as was the *Suarez* court. In this case, at issue is Defendants' personal financial information submitted in support of their Requests for Appointment of Counsel. The *Suarez* court does not discuss this issue. Therefore, Copley's reliance on *Suarez* is misplaced. Moreover, the disclosure of appointed counsel's fees *after such fees are approved,* is mandated pursuant to 18 U.S.C. 3006A(d)(A)-(E), a situation not present here.

The Court also recognizes that Copley relies on *U.S. v. Brooklier* 685 F.2d 1162 (9th Cir.1982). In *Brooklier,* the court held that the public enjoys a right of access to *voir dire* proceedings and hearing on motions to suppress evidence. The court also found that the record presented to it was insufficient to find that a taped interview of a government witness and transcripts of closed proceedings should remain inaccessible to the public. *Brooklier* does not address public accessibility to a defendant's personal financial information submitted in support of a request for appointed counsel. Therefore, *Brooklier* is not helpful to this Court's analysis.

Therefore, the Court concludes that public access to Defendants' personal financial information submitted in support of their Requests for Appointment of Counsel, does not play a significant positive role in the appointment of counsel process.

In sum, the Court finds that the documents containing the financial information

L.Ed.2d 64 (1977) and *Griswold v. Connecticut* 381 U.S. 479, 483, 85 S.Ct. 1678, 14

L.Ed.2d 510 (1965)

submitted to the Court in Support of Defendants' Requests for Appointment of Counsel are not judicial documents subject to public disclosure and press access. Moreover, even if the documents containing the financial information could be classified as judicial documents, the Court's application of the experience and logic considerations leads to the conclusion that there is no qualified First Amendment right of access that attaches to the documents containing the financial information submitted by the Defendants in support of their Requests for Appointment of Counsel. As a result, Copley's Motion for Access to Court Records is DENIED and Defendants' Motion to Seal Personal Financial Information Submitted in Support of Requests for Appointment of Counsel is GRANTED.

IT IS SO ORDERED.